ATTORNEYS FOR APPELLANTS
Jonathan L. Mayes
Chief Litigation Counsel

Justin F. Roebel
Assistant Corporation Counsel
Office of Corporation Counsel
Indianapolis, Indiana

ATTORNEYS FOR AMICI CURIAE
INDIANA ASSOCIATION OF
CITIES AND TOWNS AND
INDIANA MUNICIPAL LAWYERS
ASSOCIATION
Thomas E. Wheeler
Anthony W. Overholt
Jo Angela Woods
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES
Ronald J. Waicukauski
R. Davy Eaglesfield, III
Jana K. Strain
Indianapolis, Indiana



In the
Indiana Supreme Court

**FILED**
May 10 2011, 9:28 am

CLERK
of the supreme court,
court of appeals and
tax court

No. 49S02-1007-CV-402

CITY OF INDIANAPOLIS, ET AL.,

*Appellants (Defendants below)*,

v.

CHRISTINE ARMOUR, ET AL.,

*Appellees (Plaintiffs below)*.

Appeal from the Marion Superior Court, No. 49D11-0706-CT-026050
The Honorable John F. Hanley, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 49A02-0901-CV-84

**May 10, 2011**

**Sullivan, Justice.**

The City of Indianapolis abandoned the Barrett Law method of financing sewer improvements in favor of a new system that imposes less of a financial burden on property owners. To ease the transition, the City discharged all outstanding Barrett Law assessments owing as of November 1, 2005, but did not give refunds to those property owners who had previously paid

their Barrett Law assessments in full or in part. We hold that the City did not violate the Equal Protection Clause of the Fourteenth Amendment because forgiving only the outstanding assessment balances was rationally related to a legitimate governmental interest.

## Background

Indiana's Barrett Law[1] authorizes municipalities to provide or require public improvements and fund those improvements by levying special assessments against the benefitted properties. Town Council of New Harmony v. Parker, 726 N.E.2d 1217, 1227 n.13 (Ind. 2000) (quoting Porter v. City of Tipton, 141 Ind. 347, 40 N.E. 802, 803 (1895)). The costs of Barrett Law projects are generally "apportioned equally among all abutting lands or lots" benefitted by the improvement. I.C. § 36-9-39-15(b)(3).

Prior to 2006, the City of Indianapolis ("City") used Barrett Law to fund sanitary sewer projects.

In April, 2001, the City sent a letter to property owners in the Northern Estates neighborhood notifying them that their properties were to be part of the Brisbane/Manning Barrett Law Sanitary Sewers Project ("Brisbane/Manning Project"), under which their properties were to be connected to City sewers, eliminating the use of septic tanks in the neighborhood. In July, 2004, after complying with then-existing regulatory procedures, the Indianapolis Board of Public Works ("Board") levied a $9,278 special assessment against each parcel subject to the project.[2]

Property owners were given the option of paying the special assessment up front in its entirety or paying it in monthly installments over a 10-, 20-, or 30-year period. Those choosing the installment plan were charged an annual interest rate of 3.5% and a statutory lien[3] was placed on their properties. Of the approximately 180 parcels covered by the project, property owners of

---

[1] Ind. Code §§ 36-9-39-1 to -30 (2007).
[2] One parcel had a preexisting sewer connection and was therefore assessed only $4,639.
[3] Ind. Code § 6-1.1-22-13.5 (2010).

2

142 parcels elected to pay their special assessments in installments.[4] The owners of the remaining parcels chose to pay up front in a single lump-sum payment. The plaintiffs in this case are the owners of 31 of those parcels on which the assessment was paid up front.

The following year, the City-County Council of Indianapolis-Marion County ("Council") enacted a general ordinance under which the Barrett Law method of financing sewer projects was discontinued in favor of the Septic Tank Elimination Program ("STEP"). See Indianapolis-Marion County, Ind., City-County General Ordinance No. 107, 2005 (Oct. 31, 2005); see also Appellant's App. 320-35. The Council's action responded to two concerns. First, the City faced a public health crisis because of the continued use of out-of-date septic tanks on many properties. Second, the Barrett Law system was imposing too heavy a financial burden on middle- and low-income taxpayers, given that the average assessment under a Barrett Law project was approximately $10,000.[5]

At the time STEP was adopted, the Brisbane/Manning Project was one of more than 40 Barrett Law projects in existence. As with the Brisbane/Manning Project, some taxpayers subject to these other Barrett Law projects had elected to pay their assessments in full and some in installments. As part of the transition from Barrett Law to STEP, the Board passed Resolution 101, 2005 ("Resolution 101"), Appellant's App. 337, 350, forgiving all outstanding assessment balances on the 40-plus Barrett Law projects owing as of November 1, 2005.

As a result of Resolution 101, the owners of the 142 parcels in Northern Estates who had elected to pay their Barrett Law assessments over a period of years were discharged from their debts, along with all other taxpayers from other 40-plus Barrett Law projects who had outstanding balances due.

---

[4] Owners of 68 parcels chose the 30-year installment plan, with a monthly payment of $25.77; owners of 27 parcels chose the 20-year installment plan, with a monthly payment of $38.66; and owners of 47 parcels chose the 10-year installment plan, with a monthly payment of $77.27.

[5] Under STEP, sanitary sewer projects were to be paid for through an initial "hook-up fee" of $2,500 to connect a property to the City's sewers and through new bonds funded by increased sewer-usage rates. The lower connection fee and modest usage rates would permit more citizens' properties to be connected to the City's sewers, thereby alleviating the public health problem posed by septic tanks.

The plaintiffs in this lawsuit complain that Resolution 101 provided no relief for Northern Estates taxpayers who had paid their Barrett Law assessments in full for the Brisbane/Manning Project. But it was not just the Brisbane/Manning taxpayers who had paid their assessments in full who did not receive refunds; no taxpayers in any of the 40-plus Barrett Law projects received any refunds of the amounts they had paid, including those who had paid some but not all of their installments – thousands of taxpayers, some of whom had paid all, some a lot, and some only a little of their respective assessments. Conversely, it was not only the Brisbane/Manning taxpayers who had elected the installment plan who had their outstanding balances forgiven; all taxpayers in all of the 40-plus Barrett Law projects had their outstanding balances forgiven, including those who had paid some but not all of their installments – thousands of taxpayers, some of whom owed all, some a lot, and some only a little of their respective assessments.

In February, 2006, the plaintiffs, who, to repeat, had each paid their Barrett Law assessments in full, petitioned the Board for a refund in an amount equal to the assessments discharged for those property owners who had paid the most under an installment plan.[6] In March, 2006, the Board sent a letter to the plaintiffs denying their refund request. Appellant's App. 317-18. It reasoned that there were many other Barrett Law projects subject to forgiveness and that issuing refunds to the plaintiffs "would establish a precedent of unfair and inequitable treatment to all other property owners who have also paid Barrett Law assessments." Id. at 318. And although November 1, 2005, "might seem arbitrary to [the plaintiffs], it [was] essential for the City to establish this date and move forward with the new funding approach." Id.

In July, 2007, the plaintiffs filed their complaint against the City and several of its officials[7] seeking, among other things, a Barrett Law assessment refund. In their federal claim under 42 U.S.C. § 1983 (2006), the plaintiffs alleged that the City had violated their federal constitutional rights to due process and equal protection under the Fourteenth Amendment.[8] In March,

---

[6] The plaintiffs who paid the full $9,278 assessment each sought refunds in excess of $8,000, and the plaintiff who was assessed half sought a refund in excess of $3,400.
[7] We refer to the defendants collectively as the "City," unless otherwise specified.
[8] The plaintiffs also raised several claims under both the Indiana Constitution and various Indiana statutes, but none of those claims are issues in this appeal.

4

2008, the plaintiffs moved for summary judgment on their federal constitutional claims. The City filed a cross-motion for summary judgment, arguing that the federal claims must fail because the City had a rational basis for refusing to grant the plaintiffs relief. The trial court denied the City's motion, granted the plaintiffs' motion, and entered judgment against the City for $380,914.16.[9]

On appeal, the plaintiffs abandoned their due process claim and sought to have the trial court's judgment sustained on equal protection grounds only. The Court of Appeals affirmed, finding that the City did not have a rational basis for granting relief to those who were paying their Barrett Law assessments in installments and denying relief to those who had paid up front in a lump sum. City of Indianapolis v. Armour, 918 N.E.2d 401, 409-19 (Ind. Ct. App. 2009), reh'g denied. The Court of Appeals also held that the City could remedy the violation only by issuing refunds to the plaintiffs. Id. at 419.

The City sought, and we granted, transfer, City of Indianapolis v. Armour, 940 N.E.2d 821 (Ind. 2010) (table), thereby vacating the opinion of the Court of Appeals, Ind. Appellate Rule 58(A). Amici Curiae, the Indiana Association of Cities and Towns and the Indiana Municipal Lawyers Association, filed a brief in support of the City's Petition to Transfer.

## Discussion

The only issue presented is whether the City's forgiveness of all outstanding Barrett Law assessments as part of its transition to STEP violated the plaintiffs' rights under the Equal Protection Clause, which provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. A law attacked on equal protection grounds will be upheld if it survives rational basis review, unless the classification is drawn along suspect lines or infringes the exercise of fundamental constitutional rights, in which case it must survive heightened judicial scrutiny. FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993); Nordlinger v. Hahn, 505 U.S. 1, 10 (1992).

---

[9] The trial court failed to award prejudgment interest, and the City concedes that this was error.

5

Because Resolution 101 neither involves a suspect classification nor inhibits the exercise of a fundamental constitutional right, the parties agree that it is not subject to heightened judicial scrutiny and must be analyzed under the rational basis standard. But they offer differing interpretations and applications of that standard, which requires us to examine the intricacies of the standard itself.

**I**

Rational basis is the most deferential standard of review. Under this standard, courts will not invalidate a law merely because it is deemed unwise, unfair, or unsound, or because there are "more reasonable" or "more effective" policy choices that could have been made. Beach Communications, 508 U.S. at 313-14; Ind. Aeronautics Comm'n v. Ambassadair, Inc., 267 Ind. 137, 368 N.E.2d 1340, 1346 (1977). Rather, "[t]he Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process." Vance v. Bradley, 440 U.S. 93, 97 (1979) (footnote omitted).

Governmental decision makers are afforded the greatest leeway in making classifications and drawing lines with regard to taxation. Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973) (quoting Madden v. Kentucky, 309 U.S. 83, 88 (1940)); see also Fitzgerald v. Racing Ass'n of Cent. Iowa, 539 U.S. 103, 108 (2003) ("[T]he Constitution grants legislators, not courts, broad authority (within the bounds of rationality) to decide whom they wish to help with their tax laws and how much help those laws ought to provide."). Thus, courts are "especially deferential in the context of classifications made by complex tax laws." Nordlinger, 505 U.S. at 11.

Under the rational basis standard, laws are clothed with a strong presumption of constitutionality. Beach Communications, 508 U.S. at 314 (citation omitted); see also Nordlinger, 505 U.S. at 10 ("'[L]egislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality.'" (alteration added) (quoting McGowan v. Maryland, 366 U.S. 420, 425-26 (1961))). The party challenging the law bears the burden of proving that there is no rational basis for the government's classification, Beach

Communications, 508 U.S. at 315 (citations omitted), and this can be done "'only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes,'" Lehnhausen, 410 U.S. at 364 (quoting Madden, 309 U.S. at 88).

On the other hand, a classification survives rational basis review if (1) "there is a plausible policy reason for the classification," (2) "the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decision-maker," and (3) "the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." Nordlinger, 505 U.S. at 11 (citations omitted).

First, the government's classification must be based on policy reasons that are both legitimate and plausible. The legitimate governmental interests of states and municipalities are numerous, given their broad police powers. See, e.g., Jacobson v. Massachusetts, 197 U.S. 11, 25 (1905) (discussing breadth of states' police powers). In particular, states and local governments have a legitimate interest in their own efficient and effective operation. Cf. Garcetti v. Ceballos, 547 U.S. 410, 417-20 (2006) (limiting public employees' first amendment rights because of governmental interest in operational effectiveness and efficiency). Thus, administrative convenience and minimizing administrative costs are legitimate governmental interests. See, e.g., Carmichael v. S. Coal & Coke Co., 301 U.S. 495, 511 (1937) ("Administrative convenience and expense in the collection or measurement of the tax are alone a sufficient justification for the difference between the treatment of small incomes or small taxpayers and that meted out to others." (citations omitted)). Governments also have a legitimate interest in preserving their limited resources when granting benefits, and the U.S. Supreme Court has consistently upheld statutes and regulations that adjust the allocation of limited funds and resources, most often in the welfare context. See, e.g., Bowen v. Gilliard, 483 U.S. 587, 599 (1987) (upholding law that reduced welfare benefits for some); Lyng v. Castillo, 477 U.S. 635, 639-43 (1986) (upholding law that reduced food stamp allotment for some); Jefferson v. Hackney, 406 U.S. 535, 549 (1972) (upholding reduction of welfare benefits for some because "budgetary constraints [did] not allow the payment of the full standard of need for all welfare recipients"); cf. U.S. R.R. Ret. Bd. v. Fritz, 449 U.S. 166, 176-79 (1980) (upholding statute reducing retirement benefits for some railroad employees).

The legitimate interest justifying the classification need only be plausible. That is, it does not matter what the actual policy reason was, so long as a legitimate reason can be conceived. Beach Communications, 508 U.S. at 315 (citations omitted); Ind. Aeronautics Comm'n, 368 N.E.2d at 1344 (citation omitted). And it is no requirement that the conceivable policy in fact motivated the governmental decision maker. Beach Communications, 508 U.S. at 315 (citing Fritz, 449 U.S. at 179). Rather, a policy reason is sufficiently plausible if it "'may reasonably have been the purpose and policy' of the relevant government decisionmaker." Nordlinger, 505 U.S. at 15-16 (quoting Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 528-29 (1959)).

Second, the government's classification must be based on legislative facts which "rationally may have been considered to be true by the governmental decisionmaker." Id. at 11 (citation omitted). But the governmental decision makers are not required to prove any underlying facts on which the classification is based, Beach Communications, 508 U.S. at 315 (citing Vance v. Bradley, 440 U.S. at 111); the government need only have rationally believed to be true the facts prompting the classification, Nordlinger, 505 U.S. at 11 (citation omitted); Ind. Aeronautics Comm'n, 368 N.E.2d at 1344-46. In Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 470 (1981), for example, the U.S. Supreme Court upheld a state statute banning the sale of milk in plastic containers but allowing the sale of milk in containers made of other materials, primarily paper. The fact that the ban might not actually have promoted environmentally desirable packaging did not have to be proven; "the Equal Protection Clause [was] satisfied by [the Court's] conclusion that the Minnesota Legislature could rationally have decided that its ban on plastic nonreturnable milk jugs might foster greater use of environmentally desirable alternatives." Id. at 466 (emphasis in original). And although the Minnesota Supreme Court may have been correct that the ban was "not a sensible means of conserving energy," it is for "'legislatures, not courts, to decide on the wisdom and utility of legislation.'" Id. at 469 (quoting Ferguson v. Skrupa, 372 U.S. 726, 729 (1963)).

Third, the government is not required to use narrowly tailored classifications to serve the law's purpose. The classification needs only rationally to further the law's purpose, Nordlinger, 505 U.S. at 10 (citing City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439-41

8

(1985), and City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976) (per curiam)), and not be "so attenuated as to render the distinction arbitrary or irrational," id. at 11 (citing City of Cleburne, 473 U.S. at 446). The classification need not be drawn "'with mathematical nicety'" because the issues facing governments "'are practical ones and may justify, if they do not require, rough accommodations – illogical, it may be, and unscientific.'" Dandridge v. Williams, 397 U.S. 471, 485 (1970) (citations omitted). As the Supreme Court previously has explained:

> The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination.

Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 489 (1955) (citations omitted).

## II

Applying this standard, we find that Resolution 101 satisfies rational basis review and therefore does not run afoul of the Equal Protection Clause. Resolution 101 was part and parcel of the City-County Council's ordinance moving the City from Barrett Law to STEP.[10] Similar to the reasons prompting the overall transition to STEP, the text of Resolution 101 provides that it was enacted because Barrett Law funding imposed financial hardships on middle- and low-income property owners who were often most in need of sanitary sewers due to failing septic systems. Appellant's App. 337, 350. Providing relief or support for citizens facing financial

---

[10] On October 20, 2005, at a meeting of the Public Works Committee of the City-County Council, the director of the Department of Public Works informed the Committee of the plan to forgive all outstanding Barrett Law assessments, while not reimbursing property owners who had already paid their assessments. See Committee Meeting Minutes, Public Works Comm., City-County Council of Indianapolis-Marion County, Ind., at 6-10 (Oct. 20, 2005), available at http://www.indy.gov/eGov/Council/PDF/Committee /Minutes/PWKS102005min.pdf (last visited May 6, 2011). The Committee voted 8-0 to send Proposal No. 535, 2005, to the full City-County Council with a recommendation that it "Do Pass." Id. at 10. Although the minutes from this meeting are not included in the record, we take judicial notice of them because they constitute the "legislative history" of City-County General Ordinance No. 107, 2005, and are thus part of that codified municipal ordinance. Ind. Evidence Rule 201(b); cf. Peoples v. State, 929 N.E.2d 750, 754 & n.6 (Ind. 2010) (utilizing legislative history to explain a state criminal statute).

hardship is clearly a legitimate interest.  E.g., Fitzgerald, 539 U.S. at 108-09; Carmichael, 301 U.S. at 515 ("Support of the poor has long been recognized as a public purpose." (citing Kelly v. Pittsburgh, 104 U.S. 78, 81 (1881))).

Moreover, it was reasonable for the City to believe that property owners who had already paid their assessments were in better financial positions than those who chose installment plans. To be sure, there might be some property owners who could have paid up front but elected to pay in installments, despite being required to pay more because of interest.  And it is possible that there are some who paid up front that are currently experiencing financial hardship.  But, like in Clover Leaf Creamery, it does not matter under rational basis review what the actual facts would show, as determined in court, so long as the issue was at least debatable when the governmental decision maker acted.  Thus, the Court of Appeals erred in requiring the City to come forth with proof that all the property owners who had their assessments discharged were actually middle- or low-income participants in the Brisbane/Manning Project.  See Armour, 918 N.E.2d at 413 n.9. Finally, eliminating tax burdens is clearly a rational way of eliminating financial hardship caused by the tax burden.

There are several other interrelated plausible policy reasons for Resolution 101.[11]  As noted under Background, supra, the Brisbane/Manning Project was one of 40-plus Barrett Law

---

[11] Contrary to the plaintiffs' position and the opinion of the Court of Appeals, these policy reasons may be considered because they are consistent with and related to the purpose stated in the text of the Resolution. There are cases where a conceivable policy reason has been held to be not reasonably the purpose and policy of the governmental decision maker.  But in those cases, the text of the law includes a purpose, or the government argues for a purpose, that renders the law unconstitutional.  The government may not then save the law by arguing that such purpose was not actually the purpose of the law and rely on a different conceivable purpose that is contrary to or inconsistent with the stated purpose.  Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 529-30 (1959) (distinguishing Wheeling Steel Corp. v. Glander, 337 U.S. 562 (1949), in which the statute's stated purpose discriminated against nonresidents, but the state argued that the statute's purpose was to eliminate the discrimination against nonresidents); see also Nordlinger, 505 U.S. at 16 n.7 (discussing and applying the Allied Stores principle).
 But this exception does not prevent the government from supplementing a textual purpose with consistent or related interests.  Laws are often motivated by many purposes or objectives, which may balance with or against each other "but still serve[] the general objective when seen as a whole." Fitzgerald, 539 U.S. at 108 (citing Fritz, 449 U.S. at 181 (Stevens, J., concurring in judgment)); see also Ind. Aeronautics Comm'n, 368 N.E.2d at 1345 (discerning general legislative objective from several different and even contrary objectives).  Governmental decision makers generally are not required to articulate their objectives, Beach Communications, 508 U.S. at 315 (citing Fritz, 449 U.S. at 179), and when they do so, it aids the general public in understanding the law, as well as courts and litigants.  Moreover, such an all-

projects subject to Resolution 101. The City could have reasonably believed that the benefits of simplifying sanitary sewer funding outweighed the effort of continuing a collection system for thousands of taxpayers, some of whom owed all, some a lot, and some only a little of their respective assessments. This is particularly so since keeping the outstanding payment obligations in play would have meant not only maintaining such a collection system but also sitting on the tax liens for up to 30 years. See Carmichael, 301 U.S. at 511; see also Beach Communications, 508 U.S. at 317-19 (justifying classification on administrative efficiency and conservation of limited regulatory resources); Lehnhausen, 410 U.S. at 365 (same). And the fact that it chose to draw the line at November 1, 2005, was a matter of discretion appropriately exercised by the City and the Board. See Fitzgerald, 539 U.S. at 108 ("'The "task of classifying persons for . . . benefits . . . inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line," and the fact the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.'" (quoting Fritz, 449 U.S. at 179) (omissions in original)).

Furthermore, the decision not to issue refunds to those who had already paid implicates another legitimate interest – preservation of limited resources. The City clearly has a legitimate interest in not emptying its coffers to provide refunds to those who had already paid their assessments. The funds from the particular assessments at issue here were used to fund the Brisbane/Manning Project and had already been spent in constructing those sewers. The plaintiffs each paid for a sewer and received a sewer, along with all the attendant public health benefits associated with sanitary sewers. This was not a case in which the plaintiffs were assessed for a local benefit and did not receive that local benefit. Cf. Carmichael, 301 U.S. at 523 n.15 (providing that where a local special assessment is "apportioned to benefits it is not constitutionally defective because the assessment exceeds the benefits" (citation omitted)). It is true that those whose assessments were discharged also received a sewer and did so at a lower price. But the Equal Protection Clause does not require substantive equality among taxpayers if there is a rational basis for differing treatment, and the Court of Appeals erred in concluding otherwise.

---

or-none approach is foreign to rational basis review and its underlying principles. Cf. Ry. Express Agency, Inc. v. New York, 336 U.S. 106, 110 (1949) ("It is no requirement of equal protection that all evils of the same genus be eradicated or none at all." (citation omitted)).

The City's decision to forgive outstanding assessments was rationally related to its legitimate interests in reducing its administrative costs, providing relief for property owners experiencing financial hardship, establishing a clear transition from Barrett Law to STEP, and preserving its limited resources.

## III

Despite the well-established rational basis standard described and applied in Parts I and II, supra, the plaintiffs urge us to adopt a different standard of scrutiny. Although they label it "rational basis," it is a standard that is unknown in equal protection jurisprudence. They offer no evidence that the City's decision to enact Resolution 101 was irrational. Rather, they argue that the City bears the burden of establishing a rational basis in the first place, and, to meet its burden, the City is required to submit evidence that those whose debts were discharged were actually middle- or low-income property owners. Because the City failed to carry this burden, they argue that they are entitled to summary judgment.

## A

The plaintiffs rely primarily on the so-called "class-of-one" cases, which differ from typical equal protection cases. In typical cases, parties challenge government action that categorizes citizens into particular groups and then treats those groups differently, alleging either "that they have been arbitrarily classified as members of an 'identifiable group,'" Engquist v. Or. Dep't of Agric., 128 S. Ct. 2146, 2152 (2008) (citation omitted), or that they are indeed members of an identifiable group against which the government has unconstitutionally discriminated, e.g., Brown v. Bd. of Educ., 347 U.S. 483, 487-88 (1954) (racially segregated schools). The laws underlying typical equal protection claims may be facially discriminatory, see, e.g., Vance v. Bradley, 440 U.S. at 95 (law requiring Foreign Service employees to retire at age 60 but imposing no mandatory retirement age for Civil Service employees), or they may be facially neutral but ap-

12

plied in a way that disparately impacts an identifiable class,[12] see, e.g., Yick Wo v. Hopkins, 118 U.S. 356, 373-74 (1886) (invalidating a facially neutral ordinance because an administrative board had used its discretion under the ordinance to discriminate against individuals of Chinese ancestry).

In rare cases, a facially neutral law will be applied in a discriminatory manner against an individual or a small group of individuals whose only common characteristic is that they have been singled out for different treatment (in essence, an otherwise unidentifiable group). The absence of an identifiable class does not preclude a plaintiff from raising an equal protection claim because the Equal Protection Clause "'protect[s] persons, not groups.'" Engquist, 128 S. Ct. at 2150 (alteration in original) (quoting Adarand Constructors, Inc. v. Peña, 515 U.S. 200, 227 (1995) (emphasis omitted)). Thus, a plaintiff who is not part of an identifiable class but is singled out for discriminatory treatment can raise a "class-of-one" equal protection claim. See Vill. of Willowbrook v. Olech, 528 U.S. 562, 564-65 (2000) (per curiam).[13]

In many class-of-one cases, underlying the government's decision is animus or ill-will toward the plaintiffs. E.g., Olech v. Vill. of Willowbrook, 160 F.3d 386, 387-88 (7th Cir. 1998) (Posner, C.J.), aff'd on other grounds, Olech, 528 U.S. at 565; see also Esmail v. Macrane, 53 F.3d 176, 178-79 (7th Cir. 1995) (Posner, C.J.). The Supreme Court in Olech did not reach the question of whether the Village's subjective motivations were sufficient to state a class-of-one claim. Olech, 528 U.S. at 565. In a concurring opinion, however, Justice Breyer reasoned that "the presence of [animus or vindictiveness] in this case [was] sufficient to minimize any concern about transforming run-of-the-mill zoning cases into cases of constitutional right." Olech, 528 U.S. at 566 (Breyer, J., concurring). Subsequently, Judge Posner wrote in Bell v. Duperrault,

---

[12] Disparate impact is not sufficient, however, to trigger heightened scrutiny (if otherwise applicable). See Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 273-74 (1979) (gender classifications); Washington v. Davis, 426 U.S. 229, 239-46 (1976) (racial classifications).

[13] In Olech, the Village conditioned the connection of the plaintiffs' property to the municipal water supply on the plaintiffs' granting to the Village a 33-foot easement, even though the Village required only a 15-foot easement from other similarly situated property owners. Olech, 528 U.S. at 563. The Court held that the plaintiffs had raised a cognizable equal protection claim sufficient to withstand a motion to dismiss, acknowledging that class-of-one plaintiffs had raised successful equal protection claims where they "ha[d] been intentionally treated differently from others similarly situated" and "there [was] no rational basis for the difference in treatment." Id. at 564 (citing Sioux City Bridge Co. v. Dakota Cnty., 260 U.S. 441 (1923), and Allegheny Pittsburgh Coal Co. v. Webster Cnty. Comm'n, 488 U.S. 336 (1989)).

367 F.3d 703, 709-13 (7th Cir. 2004) (Posner, J., concurring), what is to us a most convincing argument for adopting Justice Breyer's reasoning in Olech.

The plaintiffs argue that the relevant class is limited to the property owners in Northern Estates who were subject to the Brisbane/Manning Project Barrett Law assessment. In essence, they argue this is a class-of-one case because they were treated differently than the other residents of Northern Estates.

We disagree and hold that this is not a class-of-one case. The text of Resolution 101 defines the group entitled to receive the benefit, to the exclusion of all others. It distinguishes between property owners who had outstanding Barrett Law assessments on November 1, 2005, and property owners who did not. Only those who had outstanding assessments on that date were subject to the benefit of Resolution 101. Resolution 101 does not limit the Barrett Law projects to which it applies but forgives all outstanding Barrett Law assessments, regardless of the particular project under which the assessments were levied. As discussed supra, it was not just Brisbane/Manning taxpayers who had paid their assessments in full who did not receive refunds; no taxpayers in any of the 40-plus Barrett Law projects received any refunds of the amounts they had paid, including those who had paid some but not all of their installments – thousands of taxpayers, some of whom had paid all, some a lot, and some only a little of their respective assessments.

Unlike the class-of-one cases, the Resolution makes a broad classification on the basis of a common characteristic – outstanding Barrett Law balances. Cf. Ind. Aeronautics Comm'n, 368 N.E.2d at 1347 (rejecting contention that the case was essentially a class-of-one claim because the grievance on which the claim was based was common to the whole class). And there is no evidence that the City's action was motivated by animus or ill-will toward the plaintiffs or any other property owners who did not have outstanding assessments.

14

**B**

In accepting the plaintiffs' standard, the Court of Appeals relied primarily on <u>Allegheny Pittsburgh Coal Co. v. Webster County Commission</u>, 488 U.S. 336 (1989),[14] which, along with <u>Sioux City Bridge Co. v. Dakota County</u>, 260 U.S. 441 (1923), has been characterized as a class-of-one case. <u>See</u> <u>Engquist</u>, 128 S. Ct. at 2153-54; <u>see also</u> <u>Olech</u>, 528 U.S. at 564 (relying on those cases in holding that class-of-one claims are cognizable). The Court of Appeals explicitly disregarded <u>Nordlinger</u> and <u>Fitzgerald</u>, the two most recent equal protection challenges to tax classifications, because although they "are instructive on the general principles of equal protection," they "differ on their facts from this case to such an extent that they are not helpful in resolving the question in this appeal." <u>Armour</u>, 918 N.E.2d at 411 n.8. We disagree with this analytical approach.

In <u>Allegheny Pittsburgh</u>, a West Virginia county tax assessor valued the plaintiffs' property on the basis of its recent purchase price and made only minor adjustments in the assessments of properties that had not been sold, resulting in gross disparities in tax treatment over a span of approximately ten years.[15] 488 U.S. at 338, 341-42. The Court held that the county tax assessor had violated the plaintiffs' rights to equal protection. <u>Id.</u> at 338. The county argued that its scheme was rationally related to the purpose of assessing properties at <u>true current market value</u>. <u>Id.</u> at 343. The Court held that the means were not rationally related to achieving equal assessments based on true market value because the general adjustments were not large enough to approximate the true market value of properties that had not been recently sold. <u>Id.</u> at 343-46.

In <u>Nordlinger</u>, decided three terms later, the Court held that California's Proposition 13 did not violate the Equal Protection Clause. 505 U.S. at 18. Under Proposition 13, recently sold property was assessed based on its acquisition value or the amount paid to acquire the property, but property that had not been recently acquired was assessed based on its appraised value in

---

[14] Although this seems to be the principal case relied upon by the Court of Appeals, the plaintiffs did not rely on it in their original brief, citing it only once as part of a block quotation to a different case. Appellee's Br. 12-13 (quoting <u>Engquist</u>, 128 S. Ct. at 2153-54).

[15] The adjustments made to properties that had not been recently sold were small, and it would have taken an estimated 500 years for the assessments of those properties to equalize with the assessments on the plaintiffs' properties. <u>Allegheny Pittsburgh</u>, 488 U.S. at 341-42.

1975-1976, with minor annual inflation adjustments. Id. at 5. The plaintiff estimated that she would end up paying almost $19,000 in property taxes over ten years, while her similarly situated neighbors who had not recently acquired their properties would pay only $4,100. Id. at 7.

The Court held that the classification between newer owners and older owners did not violate the Equal Protection Clause because it was rationally related to legitimate governmental interests. Nordlinger, 505 U.S. at 12-17. There were at least two rational considerations for the classification. First, the State had a legitimate interest in neighborhood preservation, which was served by permitting those residents who had owned their homes longer to pay lower property taxes. Id. at 12. Second, the State could legitimately protect long-term owners' reliance interest against having to pay higher taxes, reasoning that a new owner has all the information about the tax burden before buying and could decide not to buy, whereas an older owner may be forced to sell the home because he or she cannot satisfy the higher tax burden; that is, "the State may decide that it is worse to have owned and lost, than never to have owned at all." Id. at 12-13.

The effects of the tax schemes in Allegheny Pittsburgh and Nordlinger were the same.[16] Property that was recently sold was assessed at its acquisition value, while minor adjustments were made to the assessments of properties not recently sold. And the differing methods of assessment resulted in gross disparities in the tax burden of similarly situated property owners.

But the outcome of Nordlinger differed from the outcome in Allegheny Pittsburgh. The most critical difference was the legitimate government purpose and the relationship of the tax scheme to that purpose.[17] "Allegheny Pittsburgh was the rare case where the facts precluded any

---

[16] In fact, in Allegheny Pittsburgh, the Court expressly stated that it was not deciding the validity of California's Proposition 13. Allegheny Pittsburgh, 488 U.S. at 344 n.4.

[17] Another difference between the two cases was that the constitutional provision challenged in Nordlinger was a generally applicable state law, whereas the scheme in Allegheny Pittsburgh was an "aberrational enforcement policy," Allegheny Pittsburgh, 488 U.S. at 344 n.4, used by the county assessor, "apparently on her own initiative" and contrary to the state's constitutional, statutory, and regulatory policies, id. at 345. In Nordlinger, however, the Court addressed this difference in a footnote:

In finding Allegheny Pittsburgh distinguishable, we do not suggest that the protections of the Equal Protection Clause are any less when the classification is drawn by legislative mandate, as in this case, than by administrative action, as in Allegheny Pittsburgh. Nor do we suggest that the Equal Protection Clause constrains administrators, as in Allegheny Pittsburgh, from violating state law requiring uniformity of taxation of property.

16

plausible inference that the reason for the unequal assessment practice was to achieve the benefits of an acquisition-value tax scheme. By contrast, [the California Constitutional provision] was enacted precisely to achieve the benefits of an <u>acquisition-value system</u>." <u>Nordlinger</u>, 505 U.S. at 16 (emphasis added). We read the Court's contrasting of the cases in this way to mean that it considered <u>Allegheny Pittsburgh</u> to have been a class-of-one case – a tax policy directed at a particular taxpayer. <u>Cf. Bell</u>, 367 F.3d at 712 (Posner, J., concurring) (reasoning that "requiring proof of bad motive brings the class-of-one cases into harmony with . . . the purpose behind the equal protection clause," which "is to protect the vulnerable," even if the "vulnerable" is "a coal company that because its major assets (its mines) cannot be shifted to another state finds itself targeted for discriminatory taxation, as in <u>Allegheny Pittsburgh</u>"). It has in fact been characterized as a class-of-one case, <u>see</u> <u>Engquist</u>, 128 S. Ct. at 2153-54; <u>Olech</u>, 528 U.S. at 564; <u>Bell</u>, 367 F.3d at 712, which, again, the case before us is not, <u>see</u> Part III-A, <u>supra</u>. And at a minimum, <u>Allegheny Pittsburgh</u> has essentially been narrowed to its facts and stands as a "rare case" where the means did not rationally further the government's legitimate purpose. <u>Nordlinger</u>, 505 U.S. at 16. Additionally, it has been criticized by at least one Justice on the Supreme Court and by scholars.[18]

For these reasons, <u>Allegheny Pittsburgh</u> is inapposite, and the Court of Appeals erred in relying on that case to the exclusion of <u>Nordlinger</u> and other cases applying traditional rational-basis analysis.

---

<u>Nordlinger</u>, 505 U.S. at 16 n.8 (citations omitted).

Thus, the fact that the body that enacted Resolution 101 was a City administrative body, rather than the state or city legislature, is irrelevant. Moreover, this administrative action was a quasi-legislative rulemaking action, rather than a quasi-adjudicatory enforcement action.

[18] <u>See</u> <u>Nordlinger</u>, 505 U.S. at 18-28 (Thomas, J., concurring in part and concurring in the judgment) (providing a critical analysis of <u>Allegheny Pittsburgh</u> and suggesting it was wrong). As to criticism by scholars, see, for example, William Cohen, <u>State Law in Equality Clothing: A Comment on</u> Allegheny Pittsburgh Coal Company v. County Commission, 38 UCLA L. Rev. 87, 104 (1990) ("In time, <u>Allegheny</u> should suffer the same fate as <u>Morey v. Doud</u> – overruled as a 'decision [that] so far departs from proper equal protection analysis in cases of' taxation." (alteration in original) (citing <u>City of New Orleans v. Dukes</u>, 427 U.S. 297, 306 (1976) (per curiam), <u>overruling</u> <u>Morey v. Doud</u>, 354 U.S. 457 (1957))); Robert Jerome Glennon, <u>Taxation and Equal Protection</u>, 58 Geo. Wash. L. Rev. 261, 263 (1990) (arguing that "<u>Allegheny</u>'s analytical approach should be discarded quickly").

## C

The plaintiffs also cite a number of decisions from other jurisdictions in which courts have invalidated various debt-forgiveness measures as a violation of equal protection. In effect, they argue that granting a benefit to those who do not pay their taxes promptly but not to those who do pay their taxes promptly is per se arbitrary and capricious. The Court of Appeals also found persuasive the reasoning of these decisions. See Armour, 918 N.E.2d at 412.

The primary case relied upon by the plaintiffs, and considered persuasive by the Court of Appeals, is Armco Steel Corp. v. Michigan Department of Treasury, 358 N.W.2d 839 (Mich. 1984). In that case, corporations had two procedural remedies available to challenge their assessed franchise fees: (1) petition for a redetermination and withhold payment, or (2) pay the fee and file a written petition within three years. Id. at 844. The plaintiffs chose the second route, electing to pay the fee and then challenge it. Id. at 841. The Michigan Supreme Court had previously held that the treasury department had not had the authority to calculate the franchise fee based on its audits of the corporations. Id. at 840-41. In response to that holding, the treasury department cancelled or rescinded deficiencies that remained unpaid, but it refused to grant refunds to corporate taxpayers who had already paid the franchise fees. Id. at 841.

The Michigan Supreme Court held this practice to violate the Equal Protection Clause. Id. at 844. We find Armco Steel incorrect in its articulation of equal protection law and distinguishable on its facts.[19]

As to equal protection law, the Michigan Supreme Court did not consider whether there was a legitimate purpose and whether the means used were rationally related to furthering such a purpose. See id. at 843-44 (relying on Sioux City Bridge Co., 260 U.S. 441, a class-of-one case, and principles of substantive equality). As to the facts, there was in Armco Steel a sense of foul play present in that the initial assessment of the franchise fees had been held to be illegal, and although the treasury department gave relief to some who were assessed illegally, it did not grant

---

[19] Prior to the opinion of the Court of Appeals in this case, Armco Steel had not been cited by any courts outside of Michigan.

relief to others who were also assessed illegally. In this case, however, the plaintiffs do not challenge the validity of the original Barrett Law assessment, and there is no other evidence of animus, ill-will, foul play, or other improper motive.

We also find unpersuasive the cases from other jurisdictions cited by the plaintiffs and the Court of Appeals, which include Richey v. Wells, 166 So. 817 (Fla. 1936); State ex rel. Stephan v. Parrish, 891 P.2d 445 (Kan. 1995); State ex rel. Matteson v. Luecke, 260 N.W. 206 (Minn. 1935); State ex rel. Hostetter v. Hunt, 9 N.E.2d 676 (Ohio 1937); and Snow's Mobile Homes, Inc. v. Morgan, 494 P.2d 216 (Wash. 1972) (en banc).[20] All but one of these cases considered challenges under state constitutions, rather than challenges under the Equal Protection Clause of the Fourteenth Amendment.[21] The only case to consider a federal claim was Richey, where the court concluded that "the constitutional requirement of equal protection of the tax laws prohibits the Legislature from selecting and classifying delinquent taxpayers as the beneficiaries of special tax concessions . . . unless the same benefits are made equivalently available in some form or other to nondelinquent taxpayers." 166 So. at 819. The court's opinion, however, cited no authority for this proposition, stating only that it was the "view" of the majority opinion's author. Id.

In each of these cases, delinquent taxpayers had been granted relief from their tax obligations, but those who had paid their taxes on time received no relief. See Richey, 166 So. at 819-20 (Terrell, J., dissenting); Parrish, 891 P.2d at 454; Luecke, 260 N.W. at 208; Hunt, 9 N.E.2d at 677, 681-82; Snow's Mobile Homes, 494 P.2d at 219. Of course, the policy before us is not directed at delinquent taxpayers. Underlying several of the decisions was that the policies were arbitrary because they rewarded those who failed to pay their taxes and punished those who paid their taxes on time, thereby encouraging delinquency. See Luecke, 260 N.W. at 208 ("[T]he statute here concerned encourages and fosters tax delinquencies in the state. . . . Such result is not desirable, and demonstrates the unreasonableness of the classification."); see also Hunt, 9 N.E.2d at 683 (quoting Luecke); Parrish, 891 P.2d at 455-57 (relying on Hunt). With this rationale we

---

[20] Many of these cases were also cited in Armco Steel, 358 N.W.2d at 844 n.6.

[21] Although the Kansas Supreme Court stated that the challenged provisions of the Kansas Constitution were "substantially identical" to the Equal Protection Clause (as opposed to completely identical), Parrish, 891 P.2d at 457 (citation omitted), it did not cite any federal law in its analysis.

cannot disagree; it certainly seems that such a regime would be bad policy. But that is exactly what it is – a policy choice. And "equal protection is not a license for courts to judge the wisdom, fairness, or logic of [policy] choices." Beach Communications, 508 U.S. at 313. Thus, we do not find these decisions from other jurisdictions persuasive and decline to follow them.

## IV

Applying the appropriate standard of review under the Equal Protection Clause to the undisputed facts, we hold that Resolution 101 does not violate the Equal Protection Clause as applied in this case because it is rationally related to legitimate governmental interests. And because we find that the City did not violate the plaintiffs' rights under the Equal Protection Clause, we have no occasion to consider whether the trial court was correct in requiring the City to provide refunds to the plaintiffs or whether alternative remedies consistent with due process were available.[22]

## Conclusion

We hold that Resolution 101 does not violate the Equal Protection Clause of the Fourteenth Amendment because it is rationally related to legitimate governmental interests. Accordingly, we reverse the decision of the trial court and remand with instructions to grant judgment for the City on the plaintiffs' federal equal protection claim.

Shepard, C.J., and David, J., concur.

Rucker, J., dissents with separate opinion in which Dickson, J., concurs.

---

[22] We acknowledge that a similar claim attacking the validity of Resolution 101 was brought by a different group of plaintiffs in the United States District Court for the Southern District of Indiana and that the court there decided in the plaintiffs' favor. Cox v. City of Indianapolis, No. 1:09-cv-435-WTL-DML, 2010 U.S. Dist. LEXIS 58876, 2010 WL 2484620 (S.D. Ind. June 14, 2010); see also Cox v. City of Indianapolis, No. 1:09-cv-435-TWP-MJD, 2011 U.S. Dist. LEXIS 2890, 2011 WL 96669 (S.D. Ind. Jan. 11, 2011) (denying the City's motion to alter or amend judgment). We do not find Cox persuasive because it relied almost entirely on the now-vacated opinion of our Court of Appeals in this case, quoting from it extensively. And, as we have concluded here, it is our opinion that the Court of Appeals did not apply the appropriate equal protection standard.

**Rucker, Justice, dissenting.**

I am not persuaded that the City has advanced a rational basis for its classification between property owners who chose to pay their Barrett Law assessments in a lump sum and those who elected to pay in installments. Instead, I am of the view that Resolution 101 violates the Equal Protection Clause of the United States Constitution as applied to the homeowners in this case. Therefore I respectfully dissent.

The government has broad discretion to draw lines classifying persons for purposes of disparate treatment. FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 315-16 (1993). "But there is a point beyond which the State cannot go without violating the Equal Protection Clause." Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 527 (1959). Specifically, a government classification may not be capricious or arbitrary and "must rest upon some ground of difference having a fair and substantial relation to the object of the legislation." Id. at 527 (internal quotation marks and citations omitted).

Supreme Court jurisprudence teaches that a legislative body is not required to articulate its reasons for enacting a statute. Beach Commc'ns, 508 U.S. at 315; Nordlinger v. Hahn, 505 U.S. 1, 15 (1992). But, when a legislature does state a reason for a statutory classification, the stated reason must be rationally related to the classification made. In such circumstances, it is inappropriate to consider other conceivable or even expressed rationales for the purpose of "saving" an inadequately justified classification. See Allied Stores, 358 U.S. at 530 (recognizing that where statutes "specifically declared their purpose" they "left no room to conceive of any other purpose for their existence"); cf. Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 463 n.7 (1981) ("In equal protection analysis, this Court will assume that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces us to conclude that they could not have been a goal of the legislation." (internal quotation marks and citation omitted)).

As the majority points out, Resolution 101 itself included the City's rationale for treating the Homeowners differently from other similarly situated property owners in Northern Estates,

namely "because Barrett Law funding imposed financial hardships on middle- and low-income property owners who were often most in need of sanitary sewers due to failing septic systems." Slip op. at 9.  More specifically the Resolution provided:

> Whereas, The Board of Public Works (Board) is authorized by Indiana Code (IC) 36-9-39 to administer 'Barrett Law Funding for Municipal Sewer' program under which the Board approves all Barrett Law projects within the City of Indianapolis-Marion County, including [an] individual assessment amount per parcel, and
>
> Whereas, The Barrett Law Funding for Municipal Sewer program may present financial hardships on many middle to lower income participants who most need sanitary sewer service in lieu of failing septic systems, and
>
> Whereas, The Department of Public Works (DPW) has a proposed rate and fee increase package to the City-County Council for approval to continue to address the re-capitalization, expansion, operation and maintenance, and regulatory requirements of the City's sanitary sewer system which was approved by the City-County Council on October 31, 2005 (Proposal No. 535 as amended) effective on January 1, 2006, and
>
> Whereas, The financial model upon which Proposal No. 535 was based, considered the current assessments being made by participants in active Barrett Law projects as well as the future needs to eliminate leaking septic systems in all of the City of Indianapolis-Marion County in order to discontinue the use of Barrett Law Funding for Municipal Sewer program for the finance of sanitary sewers.
>
> Now, Therefore, Be It Resolved that [the Board] hereby forgive[s] all assessment amounts it established pursuant to the Barrett Law Funding for Municipal Sewer program due and owing from the date of November 1, 2005[,] forward to the Department of Public Works via the Barrett Law Assessment Bureau.

Appellant's App. at 350.  For the most part this resolution expresses the City's reasons for discontinuing the Barrett Law method of financing sewer projects in favor of the Septic Tank Elimination Program.  However, merely declaring that Barrett Law funding "imposed financial hardships on middle- and low-income property owners who were often most in need of sanitary

2

sewers due to failing septic systems," does nothing to explain why the City treated differently residents who elected to pay their assessments in a lump sum versus those who elected to pay in installments.

To be sure the City advanced multiple post-hoc rationalizations for the differential treatment.[1] But such arguments do not obviate the failure of the Resolution to pass rational basis scrutiny on the reasoning set forth in its text.

This is not a case like <u>Clover Leaf</u>, where the classification between plastic and non-plastic milk cartons satisfied equal protection concerns and there was evidence the legislature rationally believed the classification would further the stated objective of reducing solid waste, despite empirical evidence to the contrary. See <u>Clover Leaf</u>, 449 U.S. at 463-64, 469. Here, there is no indication that the Board even believed the classification would further its stated objective. The stated purpose in Resolution 101 simply fails to express any connection to the distinction between residents who elected to pay their assessments in a lump sum and those who elected to pay in installments. In my view this disconnect demonstrates that the classification fails to have "a fair and substantial relation" to the statutory objective. See <u>Allied Stores</u>, 358 U.S. at 527. I therefore agree with the Court of Appeals and would affirm the trial court's grant of summary judgment in favor of the homeowners.

Dickson, J., concurs.

---

[1] The Public Works Committee meeting minutes the majority cites at footnote 10 do appear to contain the reasoning of the director of the Department of Public Works for not reimbursing the homeowners, essentially because providing refunds would "simply be impossible." <u>Supra</u> Committee Meeting Minutes at 10, as cited in Slip op. at 9 n.10. This statement was made before the adoption of the Resolution, but I am not convinced this reasoning may be read in conjunction with the Resolution's stated purpose. Even if it could be considered, it only addresses why the Homeowners were not reimbursed, not why the Resolution made the chosen classification. Further, it is merely the reasoning of the Director of the Department of Public Works given in response to a citizen's question. There is no indication that such reasoning was adopted by the Board in Resolution 101. In addition the fact that most of these rationales were advanced during the course of this litigation, and nearly two and a half years after the Resolution was passed, renders them suspect in my view.