**TOWN COUNCIL OF NEW HARMONY, Indiana, Appellant (Defendant Below),**

v.

**Shirley PARKER, Appellee (Plaintiff Below).**

No. 87S01–9911–CV–673.

Supreme Court of Indiana.

April 18, 2000.

R. Thomas Bodkin, Shellie Deffendall Kyle, Charles L. Berger, Evansville, Indiana, Karl L. Mulvaney, Douglas D. Church, Indianapolis, Indiana, Attorneys for Appellant.

Robert Faulkner, Leslie C. Shively, Evansville, Indiana, Attorneys for Appellee.

Jeffrey A. Modisett, Attorney General of Indiana, A. Scott Chinn, Geoffrey Slaughter, Special Counsels to the Attorney General, Attorneys for Amicus Curiae State of Indiana.

SHEPARD, Chief Justice.

Shirley Parker owns land that Robert Dale Owen and Richard Owen added to the Town of New Harmony during the nineteenth century. It was undeveloped ground on the edge of town then, and it still is. Parker wishes to sell or develop her land, and she sued the Town seeking installation of various utilities at the Town's expense. The trial court held that the absence of these utilities constituted a taking of Parker's land. It was not.

**Facts and Procedural History**

In 1871, some subdivided land called Richard Owens' Addition to New Harmony ("the Addition") was platted and recorded in the Posey County Recorder's Office. In 1874, another subdivision called Robert Dale Owens' Eastern Enlargement of New Harmony ("the Enlargement") was similarly platted. On May 10, 1882, the New Harmony Board of Trustees passed an ordinance annexing both the Addition and the Enlargement as a part of the town.

A hundred years later in 1982, Shirley Parker purchased parts of the Enlargement, lots 10 through 17, and the east half of lot 18. In 1990, she purchased lots 1 through 8 of the Addition.

On February 28, 1995, her husband Don Parker attended a Town Council meeting and asked the Town to extend various utilities to these properties.[1] Don Parker presented plans for developing the property, which included placing a house trailer

on at least one of the lots. During the meeting, Parker turned around to town zoning administrator Gerald Blaylock and said, "[I]f you give the permits then, you know, something would have to happen." (R. at 365.) Blaylock replied, "I can't do that," (*id.*), believing that Parker would be unable to comply with the applicable zoning ordinance. It required utility hook-up within two weeks of placing a trailer on the property, and not all the utility services were available. Precisely what Parker wished to do with the land is unclear, inasmuch as he never sought a permit of any kind.

On March 9, 1995, attorney Charles Berger wrote the following to Parker on the Town's behalf:

As we understand your request as made orally by your husband, you are requesting that the Town of New Harmony provide streets, water, sewer, and gas to each of the sixteen (16) lots that you are developing. The Town of New Harmony is more than happy to provide these services to you, but we must advise you that pursuant to the laws of the State of Indiana as contained under Title 36 at I.C. § 36–9–36–2, *et seq.*, the Town of New Harmony will assess each of the lots at their pro rata share for the costs of the extension of these services. The statute for assessing the sewer services can be found at I.C. § 36–9–23–29.

If you are requesting that the Town provide these services, we will need for you [to] do so in writing, and we will then proceed with the preliminary steps necessary to have these matters properly considered by the Board, including the costs of obtaining preliminary cost studies, publishing notices of plan improvements and assessments, holding public hearings, and the conducting of said hearings. All of the costs associated, including the hearing stage, will be assessed against the lots on a pro rata basis of one-sixteenth (⅟₁₆) of the total

---

1. Although the lots at issue were technically owned by Shirley Parker, her husband Don Parker, a contractor, played an active role in the proceedings involving this property. It was Mr. Parker who requested that municipal

utilities and the like be provided to the property in response to an interest regarding development in the area. (R. at 375, 400, 401–02.)

cost if this is your desire. We await your reply if you are interested in pursuing this matter with the Town making said improvements.

(R. at 386.) This offer was, of course, not what Parker hoped for and was thus not implemented.

The following year, the Town received safety complaints about vehicles running off the end of a paved street that dead-ended into the west end of Parker's land, ("four-wheelers and two-wheelers tearing up the dirt and disturbing the neighbors," (R. at 396)). In October, the Town Board authorized placing a chain across the street at the point where the pavement stopped.

On February 26, 1996, Parker filed a complaint for declaratory judgment, stating that New Harmony had refused to "extend all municipal utilities ... at its sole expense." (R. at 14, 43.)[2] Following a bench trial, the court entered findings of fact and conclusions of law, declaring that New Harmony was required to provide streets, sidewalks, and utilities to Parker's property, and that failure to provide these services constituted a taking. The court also concluded that placing a chain across the street resulted in a taking of Parker's property.

The court ordered New Harmony to submit a plan for providing the improvements it had ordered. New Harmony submitted a plan offering two proposals: 1) that the Town "dis-annex" Parker's property, or 2) that the Town extend the requested infrastructure and assess Parker for a portion of the costs of the improvements pursuant to Ind.Code § 36–9–36–1, the "Barrett Law." The court declared these proposals inadequate and appointed appraisers to assess damages to Parker's property, although the record does not

2. Parker filed an amended complaint on August 20, 1996. (R. at 47.)

3. Not long ago, we examined certain aspects of an analogous clause in the Indiana Constitution. *Bayh v. Sonnenburg,* 573 N.E.2d 398 (Ind.1991).

contain any instructions about how the damages were to be assessed.

New Harmony appealed, and the Court of Appeals affirmed. *Town Council of New Harmony v. Parker,* 707 N.E.2d 1002 (Ind.Ct.App.1999). We granted transfer.

## I. Takings Law

■ The Fifth Amendment says, "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V.[3] While there can be little doubt that the framers intended that the amendment apply only to physical acquisition or invasion of property by the national government,[4] the Takings Clause later became incorporated into the Fourteenth Amendment and thereby made applicable to the States. *Chicago, Burlington & Quincy R.R. Co. v. Chicago,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897). Later still, the U.S. Supreme Court declared that a taking might occur even where there was no acquisition. *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922) ("[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.")

■ Still, aside from acquisition or invasion most government regulation of property does not offend the Takings Clause. *See, e.g., Herrington v. Sonoma County,* 834 F.2d 1488 (9th Cir.1987) (disapproval of development plans not a taking), *cert. denied,* 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989); *Major Media of the Southeast, Inc. v. City of Raleigh,* 792 F.2d 1269 (4th Cir.1986) (requiring billboard removal five and a half years after adoption of ordinance not a taking), *cert. denied,* 479 U.S. 1102, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987); *Landmark Land Co. v. City of*

4. *See* Note, *The Origins and Original Significance of the Just Compensation Clause of the Fifth Amendment,* 94 Yale L.J. 694 (1985).

*Denver,* 728 P.2d 1281, 1287 (Colo.1986) ("it must be shown that the 'ordinance precludes use of [the] property for *any* reasonable purpose'"; building limitations intended to promote view of mountains not a taking), *appeal dismissed sub nom., Harsh Inv. Corp. v. City of Denver,* 483 U.S. 1001, 107 S.Ct. 3222, 97 L.Ed.2d 729 (1987).

■ The Supreme Court has held that the government may, consistent with the Takings Clause, affect property values by regulation without incurring an obligation to pay under the full scope of the State's police power. This may be done when the regulation proscribes "harmful or noxious" uses of property, although the proscribed use need not rise to this level. *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1022, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

■ As Justice Scalia observed in writing for the Court in *Lucas,* where the state reasonably concludes that "the health, safety, morals, or general welfare would be promoted by prohibiting particular contemplated uses of land," compensation need not accompany prohibition. *Id.* (quoting *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 125, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)). Moreover, a landowner is not entitled to unlimited access to abutting property at all points along a highway, nor does a taking occur where ingress and egress is made more circuitous and difficult. *State v. Ensley,* 240 Ind. 472, 489, 164 N.E.2d 342, 350 (1960); *see also Jenkins v. Board of County Comm'rs,* 698 N.E.2d 1268, 1271 (Ind. Ct.App.1998), *trans. denied.*

## II. The Chain Across the Street

■ The Town claims the trial court erred in determining a taking occurred when the Town placed a chain across the unimproved portion of South Street, bordering Parker's property. (Appellant's Br. at 23.) [5]

The record reveals that although Parker's property is subdivided as lots, it is functionally one inclusive piece of undeveloped land. The property is roughly rectangular, and it is bordered by three streets, or at least by right of way dedicated for future streets. Steam Mill Street is actually a paved street that runs along the northern edge of Parker's property. South Street is just "two wheel tracks" along the southern edge. (R. at 73, 197, 306, 320.) First, Second, and Third Streets run North to South; they are paved or rocked until they reach Ms. Parker's undeveloped holding. (R. at 357.) In sum, there are no paved streets leading into Parker's property.

In the present case, the decision to place a chain across South Street did not deprive Parker of access to her property, as it is accessible by a wide variety of streets and

---

**5.** New Harmony initially asserts that Parker's claims were barred by laches. (Appellant's Br. at 14.) The equitable doctrine of laches consists of three elements: inexcusable delay in asserting a right, implied waiver from knowing acquiescence in existing conditions, and circumstances resulting in prejudice to the adverse party. *In re Geisler,* 614 N.E.2d 939, 940 (Ind.1993). The mere passage of time is insufficient to establish laches, rather, it must be shown that the delay was unreasonable. *Habig v. Bruning,* 613 N.E.2d 61, 65 (Ind.Ct.App.1993), *trans. denied.*

Here, the Town claims that there was unreasonable delay because Parker purchased her property in 1982 and 1990, yet failed to bring an action against the Town until 1996. The record reveals, however, that in 1975 the Town began pursuing the issue of providing municipal services to Parker's lots and began seeking funds to that effect. (R. at 274–83.) Between 1975 and the present time, the Town has extended water services to some of the lots, (R. at 223, 361, 413–14), and constructed storm sewers for other lots, (R. at 287). It appears that up until the time Parker filed her complaint, there was still a dispute about whether the Town was going to provide additional services. (R. at 353–54.) Therefore, Parker's delay in filing a complaint was not unreasonable, and the facts do not suggest that she acquiesced in the Town's failure to provide services. Moreover, the Town does not demonstrate prejudice. Parker's claim is not barred by laches.

rights of way. Parker presents no reason why access through South Street was particularly important or how her inconvenience in using the alternate routes was greater than that suffered by the general public. *See Young v. State,* 252 Ind. 131, 134, 246 N.E.2d 377, 379 (1969), *cert. denied,* 396 U.S. 1038, 90 S.Ct. 685, 24 L.Ed.2d 683 (1970).[6]

The facts presented at the evidentiary hearing do not support the trial court's conclusion that placing a chain at the point where paved South Street dead-ends into Parker's land constituted a taking.

## III. Issuing Permits

The Town next asserts that the trial court erred in deciding that a taking occurred when the zoning administrator indicated that he could not issue location improvements permits for Parker's property. (Appellant's Br. at 26.)

The procedural posture of this issue was a bit unusual. Parker never requested a location improvement permit from the Town, nor did she seek to have the administrator's decision reviewed by the Board of Zoning Appeals (assuming the administrator's response to Don Parker's statement at the Town Board meeting can be called a "decision").[7] Instead, she filed an action for declaratory judgment asserting that the administrator's "moratorium" con-stituted a taking without just compensation.

New Harmony argues that Parker's lawsuit is barred because she failed to exhaust all administrative remedies before filing an action with the trial court.[8] In so arguing, the Town relies on *Martin v. Monroe County Plan Comm'n,* 660 N.E.2d 1073 (Ind.Ct.App.1996), *trans. denied.* In *Martin,* the trial court dismissed plaintiffs' petition for writ of certiorari requesting review of a decision by the Monroe County Planning Commission; it held that the plaintiffs had failed to exhaust their administrative remedies by not first appealing to the Board of Zoning Appeals. *Id.* at 1074. The Court of Appeals affirmed, concluding that the plaintiffs failed to comply with the Monroe County Zoning Ordinance, which required appeals by decisions of the Plan Commission to be presented to the Board of Zoning Appeals before being presented for review in court. *Id.* at 1076.

The Town of New Harmony is correct on this point. The law contemplates that Parker should seek an improvement permit and, if the application was denied, appeal the denial to the Board of Zoning Appeals, or request a variance from the applicable zoning ordinance. *See* Ind.Code Ann. § 36–7–4–918.1 (West 1997).[9] Indiana boards of zoning appeals

---

6. Moreover, Parker does not dispute on any grounds that the Town had important reasons for blocking access from South Street. According to Ralph Hardy, a city councilman, members of the community were complaining that cars and "four-wheelers" were driving onto Parker's property where South Street became unpaved and were "tearing up the dirt and disturbing the neighbors." (R. at 396.)

7. Parker has insisted that Blaylock's position that he could not issue a permit for development on land that did not meet the legal requirements for development was a "moratorium." We think it is largely akin to what might happen if a lawyer asked the county clerk whether he would accept a lawsuit for filing without payment of the legal filing fee and the clerk answered, "I can't do that."

8. Although the Town previously failed to assert lack of subject matter jurisdiction, this claim cannot be waived. Where lack of subject matter jurisdiction in the original tribunal is apparent from the record, it is the duty of the reviewing court to raise and determine the issue sua sponte. *Board of Comm'rs v. Jewett,* 184 Ind. 63, 67, 110 N.E. 553, 555 (1915).

9. This Section states:
   A board of zoning appeals shall hear and determine appeals from and review:
   (1) any order, requirement, decision, or determination made by an administrative official, hearing officer, or staff member under the zoning ordinance;
   (2) any order, requirement, decision, or determination made by an administrative board or other body except a plan com-

are entrusted with the powers to hear such matters, and they are in the best position to "determine on appeal from a decision of an administrative official where it is argued that the official erroneously interpreted the ordinance." *Habig v. Harker,* 447 N.E.2d 1114, 1116 (Ind.Ct.App.1983). If Parker was dissatisfied with the decision by the Board of Zoning Appeals, she could then seek judicial review of its ruling. *See* Ind.Code Ann. § 36–7–4–1003 (West 1997); *Shipshewana Corp. v. LaGrange County,* 656 N.E.2d 812, 812–13 (Ind.1995).

▬▬▬ It is well-established that, if an administrative remedy is available, it must be pursued before a claimant is allowed access to the courts. *See, e.g., Austin Lakes Joint Venture v. Avon Util., Inc.,* 648 N.E.2d 641 (Ind.1995). Failure to exhaust administrative remedies deprives the trial court of subject matter jurisdiction. *Greenbrier Hills, Inc. v. Boes,* 473 N.E.2d 1040, 1042 (Ind.Ct.App.1985).

Parker argues that she should not have been required to apply for a permit or appeal to the Board of Zoning Appeals because doing so would have been futile. She reasons, "It is undisputed that the moratorium would have ma[d]e application for an improvement permit a useless exercise since the application would be dead on arrival." (Appellee's Br. at 20.)

Courts have said that exhaustion of administrative remedies may be excused where the remedy would be futile. *See Family & Social Serv. v. Methodist Hosp.,* 669 N.E.2d 186, 189 (Ind.Ct.App.1996). This case illustrates well, however, that the exhaustion requirement is much more than a procedural hoop and that it should not be dispensed with lightly on grounds of "futility."

First, when the landowner has never actually sought a permit, neither the local administrator nor the town board nor the reviewing courts can say with certainty what would have been approved or disapproved. Neither the record of the Town Board meeting where Don Parker appeared nor the record of the trial inform us exactly what Mr. and Mrs. Parker want to do and on what lots they want to do it.[10]

Second, it is not plain at all in this case that pursuing relief with the Board of Zoning Appeals would have necessarily been futile. It is apparent that the various lots owned by Mrs. Parker benefited from a variety of utilities. Some lots had storm sewers. (R. at 118.) Others had water service. (Id.) Some others had electric service nearby. (R. at 282.) Some lots had none of these.

Testimony by zoning administrator Blaylock was to the effect that he had never said he would refuse a permit on all of the Parker land.[11] He said that if it turned out that some parcels had what was needed for a particular lot that he would issue the permit. (R. at 362–63.) The only evidence in the record suggested that New Harmony's zoning administrator was pretty accommodating:

I listen and I'm very willing to take it to get a variance. If what the citizen is requesting does not meet the ordinance, I give them guidance the best of my

---

mission in relation to the enforcement of the zoning ordinance;.... Ind.Code Ann. § 36–7–4–918.1 (West 1997).

10. The nature of Parker's plans was open to doubt even at trial, where the following colloquy occurred during the cross-examination of Don Parker about possible placement of a trailer on Parker's property:

Q. Do you remember which lot it was that this discussion about the trailer park took place?
A. No I don't.

Mr. Shively: Objection. He didn't – there wasn't a discussion about a trailer park.
Mr. Bodkin: Sorry. I'll withdraw that.
Mr. Shively: There was a discussion about one unit.
Q. Do you recall which lot it was the discussion about the house trailer took place?
A. No, I do not.
(R. at 359.)

11. "I didn't say all sixteen lots. That's what they took it to say." (R. at 353.)

knowledge how they can get around it if they need to get a variance, you know. And it's not up to me to approve the variance. I have nothing to do with that.

(R. at 354.)

The vitality of this requirement was made plain in *Penn Central*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631, a landmark decision in the law of takings. In *Penn Central*, developers were denied the permits to construct a fifty-story office tower above the historic Grand Central Terminal. The Supreme Court upheld New York City's Landmarks Law and held that an unconstitutional taking had not occurred. The Court also noted:

> While the Commission's actions in denying applications to construct an office building in excess of 50 stories above the Terminal may indicate that it will refuse to issue a certificate of appropriateness for any comparably sized structure, nothing the Commission has said or done suggests an intention to prohibit *any* construction above the Terminal.... Since appellants have not sought approval for the construction of a smaller structure, we do not know that appellants will be denied any use of any portion of the airspace above the Terminal.

*Id.* at 136–37, 98 S.Ct. 2646 (citations omitted).

This Court applied the reasoning of *Penn Central* on this point in *Town of Beverly Shores v. Bagnall*, 590 N.E.2d 1059, 1064 (Ind.1992). We do not know whether New Harmony would have denied Parker any use of her property since Parker did not seek approval for her plans. *See id.*

Based on the foregoing, we conclude that Parker was required to exhaust her administrative remedies before filing an action with the trial court. Thus, the trial court lacked subject matter jurisdiction to decide whether refusal to issue permits constituted a taking.

## IV. Failure to Provide Municipal Utilities

Finally, New Harmony asserts that the trial court erred in concluding that the Town was required to provide improvements to Parker's property and in determining that the Town's plan for providing these services was inadequate.

In issuing its judgment, the trial court made the following finding of fact: "Parker, prior to filing this action, made demand on the Town of New Harmony to fulfill its obligation to provide ... services required under Indiana's statutes and the Town of New Harmony refused to do so and continues to refuse to provide said services." (R. at 119.)

■ The evidence does not support this finding. Certainly, the Town did offer to provide utilities to Parker, as attorney Berger's letter to her on the Town's behalf demonstrated. It made this offer, however, with the stipulation that Parker would be responsible for a portion of the cost of providing these services. The trial court concluded that the Town had an obligation to install these utilities on Parker's land at the expense of other taxpayers.

Parker asserts that the Town's refusal to provide services at the public expense "deprived her of economically viable use of her property." (Appellee's Br. at 18.) This language is from the law of takings. While the trial court did not specifically label the Town's failure to provide Parker with an adequate plan for services a "taking," it appointed appraisers to assess damages under the eminent domain statutes, indicating that it believed a taking occurred. *See Schuh v. State*, 251 Ind. 403, 408, 241 N.E.2d 362, 364 (1968).

■ There are two kinds of takings. One involves seizing private land for public use, like building a fire station. The other sort of taking occurs not through acquisition of title but through regulation. So-called "regulatory takings" come in many forms. They may consist, for example, of regulations that compel a property owner

to suffer a physical invasion of his property, or they may consist of regulations that deny all economically beneficial or productive use of the land. *Board of Zoning Appeals v. Leisz,* 702 N.E.2d 1026, 1028–29 (Ind.1998).

The Supreme Court has described the Takings Clause as "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central,* 438 U.S. at 123, 98 S.Ct. 2646. Deciding whether a taking occurred is an ad hoc, factual inquiry focusing on several factors: the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the governmental action. *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646.

Parker had no reasonable investment-backed expectation that must be recognized or compensated under the Fifth Amendment. Property owners are charged with knowledge of ordinances that affect their property. *Leisz,* 702 N.E.2d at 1030. When Parker purchased her property, she was deemed aware of the ordinance and she testified that she knew that the lots were not equipped with certain utilities.[12] The only reasonable expectation was that the Town may, or may not, allow her to develop the property.

The character of the governmental action points in the same direction, as it takes nothing away from Parker. *See id.* at 1031. Parker contends that the Town has an obligation to provide municipal utilities to her lots at no cost to her. This is not the case. Certain services, such as fire and police protection, have traditionally been provided to all citizens of a municipality, financed through property taxes. Certain other services, such as water, sewer, gas, electric, and roads, were traditionally thought of as proprietary and are still largely provided through assessments to the landowners of the parcels benefiting from the installation of utilities.

For example, with respect to sewer service, Ind.Code § 36–9–2–16 provides: "A unit may regulate the furnishing of the service of collecting, processing, and disposing of waste substances and domestic or sanitary sewage. This includes the power to fix the price to be charged for that service." A municipality may also charge a fee for connections to the sewer based on the pro rata cost of constructing a local or lateral sewer sufficient to serve the property. *See* Ind.Code Ann. § 36–9–23–29 (West 1997).

12. At trial, the following colloquy occurred:

Q. When you acquired these parcels, Mrs. Parker, did you go look at them before you paid the money to get the deeds?
A. I certainly did.
Q. And you were aware that at the time that you acquired lots eleven and seventeen and half of ten in 1982 that there were no paved streets there.
A. Right.
Q. No sidewalks.
A. Right.
Q. No water.
A. Right.
Q. No gas.
A. Right.
Q. No electric.
A. Right.
Q. No street lights.
A. Right. When I purchased—
Q. Yes.
A. May I answer?

Q. When you purchased the lots.
A. When I purchased the lots there was also two more lots that had a house on it, and I bought it for the house and the lots.
Q. I see. All right. That would've been— what street was the house on?
A. That house was on Steam Mill.
Q. I see. And Steam Mill is a paved street—
A. Right.
Q. —that has all municipal facilities there.
A. Uh-huh.
Q. And when you acquired lots one through eight in 1990—
A. Right.
Q. —you went and looked at the ground.
A. Sure.
Q. And you were aware at the time you bought the lots that there was no municipal facilities available to those lots.
A. Right.
(R. at 227–29.)

The same is true of new streets and roads. Under Ind.Code § 36–9–2–5, a municipal body has exclusive control over, and regulation of, its streets. *See Town of Syracuse v. Abbs*, 694 N.E.2d 284, 286 (Ind.Ct.App.1998); *Cason v. City of Lebanon*, 153 Ind. 567, 572, 55 N.E. 768, 770 (1899). With this control comes the power to assess property owners for improvements upon or maintenance of streets. *See* Ind.Code Ann. § 8–23–6–5 (West Supp.1999) ("This chapter does not annul, limit, or abridge the right of a city or town, either at its own expense *or at the expense of property owners subject to assessment,* to improve the sidewalks and curbs along a street . . ., to construct sewers and drains, or to construct or maintain a part of the roadway of the street not improved or maintained by the [Department of Transportation].") (emphasis added).

Regarding water, Ind.Code § 36–9–2–14 states that a unit may regulate and furnish water to the public and establish, maintain, and operate waterworks. With this power, we have long held, comes the power to assess the properties benefiting from such service. *See City of Angola v. Croxton,* 185 Ind. 250, 112 N.E. 385 (1916).

The reasoning behind the power of assessment was explained in *Baldwin v. Moroney,* 173 Ind. 574, 579, 91 N.E. 3, 5–6 (1910) (internal quotations omitted) where we stated:

> Every one who acquires an interest in land takes it subject to the right of the sovereign to lay general taxes upon it and to impose upon it the burden of paying the expenses of public improvements which confer upon the land a

special benefit. . . . Whoever holds an interest in the land profits by the appurtenance, and ought, in justice, to be subjected to the lien which secures the assessment.

Here, the Town responded appropriately to Parker's request for installation of utilities, by offering to provide Parker with various pieces of beneficial infrastructure under the condition that she assume responsibility for some of the cost of the improvements pursuant to the Barrett Law, Ind.Code § 36–9–36–1.[13] This plan proposed to bring appropriate utilities to Parker's property without requiring users to pay the bill.

We conclude that the trial court erred in finding the Town's proposed improvement plan inadequate and in appointing appraisers to assess damages.

### Conclusion

The trial court erred in determining that Parker's property had been taken when the Town placed a chain across a street bordering her property and when the Town's zoning administrator said he could not issue improvement permits for Parker's property. The Town did not "take" Parker's land when it asked her to pay a share of the cost of extending additional utilities.

Accordingly, we reverse the trial court.

DICKSON, SULLIVAN, BOEHM, and RUCKER, JJ., concur.

---

**13.** The "Barrett Law," originally enacted in 1889, provides the statutory process by which a municipality may provide or require public improvements. Ind.Code Ann. § 36–9–36–1, –67 (West 1997). Concerning the Barrett Law, this Court has stated:

> It was the purpose, spirit, and language of the [Barrett Law] to enable the city to require improvements, . . . to dictate the character of the improvements; to contract for the improvements; to enforce the payment of benefits by the property owners, to aid the property-owner in deferring such

payments by issuing the bonds of the city, from the proceeds sales of which to pay the contractor, and from the annual payments of the property owner upon his assessments to meet the maturing bonds.

*Porter v. City of Tipton,* 141 Ind. 347, 350, 40 N.E. 802, 803 (1895).

This statute covers the following improvements by a municipality: sidewalks, curbs, streets, alleys, paved public places, lighting, and a water main extension for a municipality that owns and operates a water utility. Ind. Code Ann. § 36–9–36–2(b) (West 1997).