(Slip Opinion) OCTOBER TERM, 2011 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ARMOUR ET AL. *v.* CITY OF INDIANAPOLIS, INDIANA, ET AL.

### CERTIORARI TO THE SUPREME COURT OF INDIANA

No. 11–161.   Argued February 29, 2012—Decided June 4, 2012

For decades, Indianapolis (City) funded sewer projects using Indiana's Barrett Law, which permitted cities to apportion a public improvement project's costs equally among all abutting lots. Under that system, a city would create an initial assessment, dividing the total estimated cost by the number of lots and making any necessary adjustments. Upon a project's completion, the city would issue a final lot-by-lot assessment. Lot owners could elect to pay the assessment in a lump sum or over time in installments.

After the City completed the Brisbane/Manning Sanitary Sewers Project, it sent affected homeowners formal notice of their payment obligations. Of the 180 affected homeowners, 38 elected to pay the lump sum. The following year, the City abandoned Barrett Law financing and adopted the Septic Tank Elimination Program (STEP), which financed projects in part through bonds, thereby lowering individual owner's sewer-connection costs. In implementing STEP, the City's Board of Public Works enacted a resolution forgiving all assessment amounts still owed pursuant to Barrett Law financing. Homeowners who had paid the Brisbane/Manning Project lump sum received no refund, while homeowners who had elected to pay in installments were under no obligation to make further payments.

The 38 homeowners who paid the lump sum asked the City for a refund, but the City denied the request. Thirty-one of these homeowners brought suit in Indiana state court claiming, in relevant part, that the City's refusal violated the Federal Equal Protection Clause. The trial court granted summary judgment to the homeowners, and the State Court of Appeals affirmed. The Indiana Supreme Court reversed, holding that the City's distinction between those who had already paid and those who had not was rationally related to its legiti-

mate interests in reducing administrative costs, providing financial hardship relief to homeowners, transitioning from the Barrett Law system to STEP, and preserving its limited resources.

*Held:* The City had a rational basis for its distinction and thus did not violate the Equal Protection Clause. Pp. 6–14.

(a) The City's classification does not involve a fundamental right or suspect classification. See *Heller* v. *Doe*, 509 U. S. 312, 319–320. Its subject matter is local, economic, social, and commercial. See *United States* v. *Carolene Products Co.*, 304 U. S. 144, 152. It is a tax classification. See *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540, 547. And no one claims that the City has discriminated against out-of-state commerce or new residents. Cf. *Hooper* v. *Bernalillo County Assessor*, 472 U. S. 612. Hence, the City's distinction does not violate the Equal Protection Clause as long as "there is any reasonably conceivable state of facts that could provide a rational basis for the classification," *FCC* v. *Beach Communications, Inc.*, 508 U. S. 307, 313, and the "'burden is on the one attacking the [classification] to negative every conceivable basis which might support it,'" *Heller, supra,* at 320. Pp. 6–7.

(b) Administrative concerns can ordinarily justify a tax-related distinction, see, *e.g.*, *Carmichael* v. *Southern Coal & Coke Co.*, 301 U. S. 495, 511–512, and the City's decision to stop collecting outstanding Barrett Law debts finds rational support in the City's administrative concerns. After the City switched to the STEP system, any decision to continue Barrett Law debt collection could have proved complex and expensive. It would have meant maintaining an administrative system for years to come to collect debts arising out of 20-plus different construction projects built over the course of a decade, involving monthly payments as low as $25 per household, with the possible need to maintain credibility by tracking down defaulting debtors and bringing legal action. The rationality of the City's distinction draws further support from the nature of the line-drawing choices that confronted it. To have added refunds to forgiveness would have meant adding further administrative costs, namely the cost of processing refunds. And limiting refunds only to Brisbane/Manning homeowners would have led to complaints of unfairness, while expanding refunds to the apparently thousands of other Barrett Law project homeowners would have involved an even greater administrative burden. Finally, the rationality of the distinction draws support from the fact that the line that the City drew—distinguishing past payments from future obligations—is well known to the law. See, *e.g.*, 26 U. S. C. §108(a)(1)(E). Pp. 7–10.

(c) Petitioners' contrary arguments are unpersuasive. Whether financial hardship is a factor supporting rationality need not be con-

sidered here, since the City's administrative concerns are sufficient to show a rational basis for its distinction. Petitioners propose other forgiveness systems that they argue are superior to the City's system, but the Constitution only requires that the line actually drawn by the City be rational. Petitioners further argue that administrative considerations alone should not justify a tax distinction lest a city justify an unfair system through insubstantial administrative considerations. Here it was rational for the City to draw a line that avoided the administrative burden of both collecting and paying out small sums for years to come. Petitioners have not shown that the administrative concerns are too insubstantial to justify the classification. Finally, petitioners argue that precedent makes it more difficult for the City to show a rational basis, but the cases to which they refer involve discrimination based on residence or length of residence. The one exception, *Allegheny Pittsburgh Coal Co.* v. *Commission of Webster Cty.*, 488 U. S. 336, is distinguishable. Pp. 10–14.

946 N. E. 2d 553, affirmed.

BREYER, J., delivered the opinion of the Court, in which KENNEDY, THOMAS, GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined. ROBERTS, C. J., filed a dissenting opinion, in which SCALIA and ALITO, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 11–161

CHRISTINE ARMOUR, ET AL., PETITIONERS *v.* CITY OF INDIANAPOLIS, INDIANA, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF INDIANA

[June 4, 2012]

JUSTICE BREYER delivered the opinion of the Court.

For many years, an Indiana statute, the "Barrett Law," authorized Indiana's cities to impose upon benefited lot owners the cost of sewer improvement projects. The Law also permitted those lot owners to pay either immediately in the form of a lump sum or over time in installments. In 2005, the city of Indianapolis (City) adopted a new assessment and payment method, the "STEP" plan, and it forgave any Barrett Law installments that lot owners had not yet paid.

A group of lot owners who had already paid their entire Barrett Law assessment in a lump sum believe that the City should have provided them with equivalent refunds. And we must decide whether the City's refusal to do so unconstitutionally discriminates against them in violation of the Equal Protection Clause, Amdt. 14, §1. We hold that the City had a rational basis for distinguishing between those lot owners who had already paid their share of project costs and those who had not. And we conclude that there is no equal protection violation.

# I
## A

Beginning in 1889 Indiana's Barrett Law permitted cities to pay for public improvements, such as sewage projects, by "apportion[ing]" the costs of a project "equally among all abutting lands or lots." Ind. Code §36–9–39–15(b)(3) (2011); see *Town Council of New Harmony* v. *Parker*, 726 N. E. 2d 1217, 1227, n. 13 (Ind. 2000) (project's beneficiaries pay its costs). When a city built a Barrett Law project, the city's public works board would create an initial lot-owner assessment by "dividing the estimated total cost of the sewage works by the total number of lots." §36–9–39–16(a). It might then adjust an individual assessment downward if the lot would benefit less than would others. §36–9–39–17(b). Upon completion of the project, the board would issue a final lot-by-lot assessment.

The Law permitted lot owners to pay the assessment either in a single lump sum or over time in installment payments (with interest). The City would collect installment payments "in the same manner as other taxes." §36–9–37–6. The Law authorized 10-, 20-, or 30-year installment plans. §36–9–37–8.5(a). Until fully paid, an assessment would constitute a lien against the property, permitting the city to initiate foreclosure proceedings in case of a default. §§36–9–37–9(b), –22.

For several decades, Indianapolis used the Barrett Law system to fund sewer projects. See, *e.g., Conley* v. *Brummit*, 92 Ind. App. 620, 621, 176 N. E. 880, 881 (1931) (in banc). But in 2005, the City adopted a new system, called the Septic Tank Elimination Program (STEP), which financed projects in part through bonds, thereby lowering individual lot owners' sewer-connection costs. By that time, the City had constructed more than 40 Barrett Law projects. App. to Pet. for Cert. 5a. We are told that installment-paying lot owners still owed money in respect

to 24 of those projects. See Reply Brief for Petitioners 16–17, n. 3 (citing City's Response to Plaintiff's Brief on Damages, Record in *Cox* v. *Indianapolis*, No. 1:09–cv–0435 (SD Ind., Doc. 98–1 (Exh. A)). In respect to 21 of the 24, some installment payments had not yet fallen due; in respect to the other 3, those who owed money were in default. Reply Brief for Petitioners 17, n. 3.

## B

This case concerns one of the 24 still-open Barrett Law projects, namely the Brisbane/Manning Sanitary Sewers Project. The Brisbane/Manning Project began in 2001. It connected about 180 homes to the City's sewage system. Construction was completed in 2003. The Indianapolis Board of Public Works held an assessment hearing in June 2004. And in July 2004 the Board sent the 180 affected homeowners a formal notice of their payment obligations.

The notice made clear that each homeowner could pay the entire assessment—$9,278 per property—in a lump sum or in installments, which would include interest at a 3.5% annual rate. Under an installment plan, payments would amount to $77.27 per month for 10 years; $38.66 per month for 20 years; or $25.77 per month for 30 years. In the event, 38 homeowners chose to pay up front; 47 chose the 10-year plan; 27 chose the 20-year plan; and 68 chose the 30-year plan. And in the first year each homeowner paid the amount due ($9,278 upfront; $927.80 under the 10-year plan; $463.90 under the 20-year plan, or $309.27 under the 30-year plan). App. to Pet. for Cert. 48a.

The next year, however, the City decided to abandon the Barrett Law method of financing. It thought that the Barrett Law's lot-by-lot payments had become too burdensome for many homeowners to pay, discouraging changes from less healthy septic tanks to healthier sewer systems.

See *id.,* at 4a–5a. (For example, homes helped by the Brisbane/Manning Project, at a cost of more than $9,000 each, were then valued at $120,000 to $270,000. App. 67.) The City's new STEP method of financing would charge each connecting lot owner a flat $2,500 fee and make up the difference by floating bonds eventually paid for by all lot owners citywide. See App. to Pet. for Cert. 5a, n. 5.

On October 31, 2005, the City enacted an ordinance implementing its decision. In December, the City's Board of Public Works enacted a further resolution, Resolution 101, which, as part of the transition, would "forgive *all assessment amounts* . . . established pursuant to the Barrett Law Funding for Municipal Sewer programs *due and owing* from the date of November 1, 2005 forward." App. 72 (emphasis added). In its preamble, the Resolution said that the Barrett Law "may present financial hardships on many middle to lower income participants who most need sanitary sewer service in lieu of failing septic systems"; it pointed out that the City was transitioning to the new STEP method of financing; and it said that the STEP method was based upon a financial model that had "considered the current assessments being made by participants in active Barrett Law projects" as well as future projects. *Id.,* at 71–72. The upshot was that those who still owed Barrett Law assessments would not have to make further payments but those who had already paid their assessments would not receive refunds. This meant that homeowners who had paid the full $9,278 Brisbane/Manning Project assessment in a lump sum the preceding year would receive no refund, while homeowners who had elected to pay the assessment in installments, and had paid a total of $309.27, $463.90, or $927.80, would be under no obligation to make further payments.

In February 2006, the 38 homeowners who had paid the full Brisbane/Manning Project assessment asked the City for a partial refund (in an amount equal to the smallest

forgiven Brisbane/Manning installment debt, apparently $8,062). The City denied the request in part because "[r]efunding payments made in your project area, or any portion of the payments, would establish a precedent of unfair and inequitable treatment to all other property owners who have also paid Barrett Law assessments . . . and while [the November 1, 2005, cutoff date] might seem arbitrary to you, it is essential for the City to establish this date and move forward with the new funding approach." *Id.,* at 50–51.

## C

Thirty-one of the thirty-eight Brisbane/Manning Project lump-sum homeowners brought this lawsuit in Indiana state court seeking a refund of about $8,000 each. They claimed in relevant part that the City's refusal to provide them with refunds at the same time that the City forgave the outstanding Project debts of other Brisbane/Manning homeowners violated the Federal Constitution's Equal Protection Clause, Amdt. 14, §1; see also Rev. Stat. §1979, 42 U. S. C. §1983. The trial court granted summary judgment in their favor. The State Court of Appeals affirmed that judgment. 918 N. E. 2d 401 (2009). But the Indiana Supreme Court reversed. 946 N. E. 2d 553 (2011). In its view, the City's distinction between those who had already paid their Barrett Law assessments and those who had not was "rationally related to its legitimate interests in reducing its administrative costs, providing relief for property owners experiencing financial hardship, establishing a clear transition from [the] Barrett Law to STEP, and preserving its limited resources." App. to Pet. for Cert. 19a. We granted certiorari to consider the equal protection question. And we now affirm the Indiana Supreme Court.

## II

### A

As long as the City's distinction has a rational basis, that distinction does not violate the Equal Protection Clause. This Court has long held that "a classification neither involving fundamental rights nor proceeding along suspect lines . . . cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller* v. *Doe*, 509 U. S. 312, 319–320 (1993); cf. *Gulf, C. & S. F. R. Co.* v. *Ellis*, 165 U. S. 150, 155, 165–166 (1897). We have made clear in analogous contexts that, where "ordinary commercial transactions" are at issue, rational basis review requires deference to reasonable underlying legislative judgments. *United States* v. *Carolene Products Co.*, 304 U. S. 144, 152 (1938) (due process); see also *New Orleans* v. *Dukes*, 427 U. S. 297, 303 (1976) *(per curiam)* (equal protection). And we have repeatedly pointed out that "[l]egislatures have especially broad latitude in creating classifications and distinctions in tax statutes." *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540, 547 (1983); see also *Fitzgerald* v. *Racing Assn. of Central Iowa*, 539 U. S. 103, 107–108 (2003); *Nordlinger* v. *Hahn*, 505 U. S. 1, 11 (1992); *Lehnhausen* v. *Lake Shore Auto Parts Co.*, 410 U. S. 356, 359 (1973); *Madden* v. *Kentucky*, 309 U. S. 83, 87–88 (1940); *Citizens' Telephone Co. of Grand Rapids* v. *Fuller*, 229 U. S. 322, 329 (1913).

Indianapolis' classification involves neither a "fundamental right" nor a "suspect" classification. Its subject matter is local, economic, social, and commercial. It is a tax classification. And no one here claims that Indianapolis has discriminated against out-of-state commerce or new residents. Cf. *Hooper* v. *Bernalillo County Assessor*, 472 U. S. 612 (1985); *Williams* v. *Vermont*, 472 U. S. 14 (1985); *Metropolitan Life Ins. Co.* v. *Ward*, 470 U. S. 869 (1985);

*Zobel* v. *Williams*, 457 U. S. 55 (1982). Hence, this case falls directly within the scope of our precedents holding such a law constitutionally valid if "there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Nordlinger*, *supra,* at 11 (citations omitted). And it falls within the scope of our precedents holding that there is such a plausible reason if "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC* v. *Beach Communications, Inc.*, 508 U. S. 307, 313 (1993); see also *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61, 78 (1911).

Moreover, analogous precedent warns us that we are not to "pronounc[e]" this classification "unconstitutional unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators." *Carolene Products Co.*, *supra,* at 152 (due process claim). Further, because the classification is presumed constitutional, the "'burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" *Heller*, *supra,* at 320 (quoting *Lehnhausen*, *supra,* at 364).

## B

In our view, Indianapolis' classification has a rational basis. Ordinarily, administrative considerations can justify a tax-related distinction. See, *e.g., Carmichael* v. *Southern Coal & Coke Co.*, 301 U. S. 495, 511–512 (1937) (tax exemption for businesses with fewer than eight employees rational in light of the "[a]dministrative conven-

ience and expense" involved); see also *Lehnhausen, supra,* at 365 (comparing administrative cost of taxing corporations versus individuals); *Madden, supra,* at 90 (comparing administrative cost of taxing deposits in local banks versus those elsewhere). And the City's decision to stop collecting outstanding Barrett Law debts finds rational support in related administrative concerns.

The City had decided to switch to the STEP system. After that change, to continue Barrett Law unpaid-debt collection could have proved complex and expensive. It would have meant maintaining an administrative system that for years to come would have had to collect debts arising out of 20-plus different construction projects built over the course of a decade, involving monthly payments as low as $25 per household, with the possible need to maintain credibility by tracking down defaulting debtors and bringing legal action. The City, for example, would have had to maintain its Barrett Law operation within the City Controller's Office, keep files on old, small, installment-plan debts, and (a City official says) possibly spend hundreds of thousands of dollars keeping computerized debt-tracking systems current. See Brief for International City/County Management Association et al. as *Amici Curiae* 13, n. 12 (citing Affidavit of Charles White ¶13, Record in *Cox,* Doc. No. 57–3). Unlike the collection system prior to abandonment, the City would not have added any new Barrett Law installment-plan debtors. And that fact means that it would have had to spread the fixed administrative costs of collection over an ever-declining number of debtors, thereby continuously increasing the per-debtor cost of collection.

Consistent with these facts, the Director of the City's Department of Public Works later explained that the City decided to forgive outstanding debt in part because "[t]he administrative costs to service and process remaining balances on Barrett Law accounts long past the transition

to the STEP program would not benefit the taxpayers" and would defeat the purpose of the transition. App. 76. The four other members of the City's Board of Public Works have said the same. See Affidavit of Gregory Taylor ¶6, Record in *Cox,* Doc. No. 57–5; Affidavit of Kipper Tew ¶6, *ibid.* Doc. No. 57–6; Affidavit of Susan Schalk ¶6, *ibid.* Doc. No. 57–7; Affidavit of Roger Brown ¶6, *ibid.* Doc. No. 57–8.

The rationality of the City's distinction draws further support from the nature of the line-drawing choices that confronted it. To have added refunds to forgiveness would have meant adding yet further administrative costs, namely the cost of processing refunds. At the same time, to have tried to limit the City's costs and lost revenues by limiting forgiveness (or refund) rules to Brisbane/Manning homeowners alone would have led those involved in other Barrett Law projects to have justifiably complained about unfairness. Yet to have granted refunds (as well as providing forgiveness) to all those involved in all Barrett Law projects (there were more than 40 projects) or in all open projects (there were more than 20) would have involved even greater administrative burden. The City could not just "cut . . . checks," *post,* at 4 (ROBERTS, C. J., dissenting), without taking funding from other programs or finding additional revenue. If, instead, the City had tried to keep the amount of revenue it lost constant (a rational goal) but spread it evenly among the apparently thousands of homeowners involved in any of the Barrett Laws projects, the result would have been yet smaller individual payments, even more likely to have been too small to justify the administrative expense.

Finally, the rationality of the distinction draws support from the fact that the line that the City drew—distinguishing past payments from future obligations—is a line well known to the law. Sometimes such a line takes the form of an amnesty program, involving, say, mortgage

payments, taxes, or parking tickets. *E.g.,* 26 U. S. C. §108(a)(1)(E) (2006 ed., Supp. IV) (federal income tax provision allowing homeowners to omit from gross income newly forgiven home mortgage debt); *United States* v. *Martin*, 523 F. 3d 281, 284 (CA4 2008) (tax amnesty program whereby State newly forgave penalties and liabilities if taxpayer satisfied debt); *Horn* v. *Chicago*, 860 F. 2d 700, 704, n. 9 (CA7 1988) (city parking ticket amnesty program whereby outstanding tickets could be newly settled for a fraction of amount specified). This kind of line is consistent with the distinction that the law often makes between actions previously taken and those yet to come.

C

Petitioners' contrary arguments are not sufficient to change our conclusion. Petitioners point out that the Indiana Supreme Court also listed a different consideration, namely "financial hardship," as one of the factors supporting rationality. App. to Pet. for Cert. 19a. They refer to the City's resolution that said that the Barrett Law "may present financial hardships on many middle to lower income participants who most need sanitary sewer service in lieu of failing septic systems." App. 71. And they argue that the tax distinction before us would not necessarily favor low-income homeowners.

We need not consider this argument, however, for the administrative considerations we have mentioned are sufficient to show a rational basis for the City's distinction. The Indiana Supreme Court wrote that the City's classification was "rationally related" in part "to its legitimate interests *in reducing its administrative costs*." App. to Pet. for Cert. 19a (emphasis added). The record of the City's proceedings is consistent with that determination. See App. 72 (when developing transition, the City "considered the current assessments being made by participants in active Barrett Law projects"). In any event, a legisla-

ture need not "actually articulate at any time the purpose or rationale supporting its classification." *Nordlinger*, 505 U. S., at 15; see also *Fitzgerald*, 539 U. S., at 108 (similar). Rather, the "burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Madden*, 309 U. S., at 88; see *Heller*, 509 U. S., at 320 (same); *Lehnhausen*, 410 U. S., at 364 (same); see also *Allied Stores of Ohio, Inc.* v. *Bowers*, 358 U. S. 522, 530 (1959) (upholding state tax classification resting "upon a state of facts that reasonably can be conceived" as creating a rational distinction). Petitioners have not "negative[d]" the Indiana Supreme Court's first listed justification, namely the administrative concerns we have discussed.

Petitioners go on to propose various other forgiveness systems that would have included refunds for at least some of those who had already paid in full. They argue that those systems are superior to the system that the City chose. We have discussed those, and other possible, systems earlier. *Supra,* at 8–9. Each has advantages and disadvantages. But even if petitioners have found a superior system, the Constitution does not require the City to draw the perfect line nor even to draw a line superior to some other line it might have drawn. It requires only that the line actually drawn be a rational line. And for the reasons we have set forth in Part II–B, *supra,* we believe that the line the City drew here is rational.

Petitioners further argue that administrative considerations alone should not justify a tax distinction, lest a city arbitrarily allocate taxes among a few citizens while forgiving many similarly situated citizens on the ground that it is cheaper and easier to collect taxes from a few people than from many. Brief for Petitioners 45. Petitioners are right that administrative considerations could not justify such an unfair system. But that is not because administrative considerations can *never* justify tax differences

(any more than they can *always* do so). The question is whether reducing those expenses, in the particular circumstances, provides a rational basis justifying the tax difference in question.

In this case, "in the light of the facts made known or generally assumed," *Carolene Products Co.*, 304 U. S., at 152, it is reasonable to believe that to graft a refund system onto the City's forgiveness decision could have (for example) imposed an administrative burden of both collecting and paying out small sums (say, $25 per month) for years. As we have said, *supra,* at 7–9, it is rational for the City to draw a line that avoids that burden. Petitioners, who are the ones "attacking the legislative arrangement," have the burden of showing that the circumstances are otherwise, *i.e.,* that the administrative burden is too insubstantial to justify the classification. That they have not done.

Finally, petitioners point to precedent that in their view makes it more difficult than we have said for the City to show a "rational basis." With but one exception, however, the cases to which they refer involve discrimination based on residence or length of residence. *E.g., Hooper* v. *Bernalillo County Assessor*, 472 U. S. 612 (state tax preference distinguishing between long-term and short-term resident veterans); *Williams* v. *Vermont*, 472 U. S. 14 (state use tax that burdened out-of-state car buyers who moved in-state); *Metropolitan Life Ins. Co.* v. *Ward*, 470 U. S. 869 (state law that taxed out-of-state insurance companies at a higher rate than in-state companies); *Zobel* v. *Williams*, 457 U. S. 55 (state dividend distribution system that favored long-term residents). But those circumstances are not present here.

The exception consists of *Allegheny Pittsburgh Coal Co.* v. *Commission of Webster Cty.*, 488 U. S. 336 (1989). The Court there took into account a state constitution and related laws that required equal valuation of equally

valuable property. *Id.,* at 345. It considered the constitutionality of a county tax assessor's practice (over a period of many years) of determining property values as of the time of the property's last sale; that practice meant highly unequal valuations for two identical properties that were sold years or decades apart. *Id.,* at 341. The Court first found that the assessor's practice was not rationally related to the county's avowed purpose of assessing properties equally at true current value because of the intentional systemic discrepancies the practice created. *Id.,* at 343–344. The Court then noted that, in light of the state constitution and related laws requiring equal valuation, there could be no other rational basis for the practice. *Id.,* at 344–345. Therefore, the Court held, the assessor's discriminatory policy violated the Federal Constitution's insistence upon "equal protection of the law." *Id.,* at 346.

Petitioners argue that the City's refusal to add refunds to its forgiveness decision is similar, for it constitutes a refusal to apply "equally" an Indiana state law that says that the costs of a Barrett Law project shall be equally "apportioned." Ind. Code §36–9–39–15(b)(3). In other words, petitioners say that even if the City's decision might otherwise be related to a rational purpose, state law (as in *Allegheny*) makes this the rare case where the facts preclude any rational basis for the City's decision other than to comply with the state mandate of equality.

*Allegheny,* however, involved a clear state law requirement clearly and dramatically violated. Indeed, we have described *Allegheny* as "the rare case where the facts precluded" any alternative reading of state law and thus any alternative rational basis. *Nordlinger*, 505 U. S., at 16. Here, the City followed state law by apportioning the cost of its Barrett Law projects equally. State law says nothing about forgiveness, how to design a forgiveness program, or whether or when rational distinctions in doing so are permitted. To adopt petitioners' view would risk

transforming ordinary violations of ordinary state tax law into violations of the Federal Constitution.

*       *       *

For these reasons, we conclude that the City has not violated the Federal Equal Protection Clause. And the Indiana Supreme Court's similar determination is

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

No. 11–161

CHRISTINE ARMOUR, ET AL., PETITIONERS *v.* CITY OF INDIANAPOLIS, INDIANA, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF INDIANA

[June 4, 2012]

CHIEF JUSTICE ROBERTS, with whom JUSTICE SCALIA and JUSTICE ALITO join, dissenting.

Twenty-three years ago, we released a succinct and unanimous opinion striking down a property tax scheme in West Virginia on the ground that it clearly violated the Equal Protection Clause. *Allegheny Pittsburgh Coal Co.* v. *Commission of Webster Cty.*, 488 U. S. 336 (1989). In *Allegheny Pittsburgh*, we held that a county failed to comport with equal protection requirements when it assessed property taxes primarily on the basis of purchase price, with no appropriate adjustments over time. The result was that new property owners were assessed at "roughly 8 to 35 times" the rate of those who had owned their property longer. *Id.,* at 344. We found such a "gross disparit[y]" in tax levels could not be justified in a state system that demanded that "taxation . . . be equal and uniform." *Id.,* at 338; W. Va. Const., Art. X, §1. The case affirmed the common-sense proposition that the Equal Protection Clause is violated by state action that deprives a citizen of even "rough equality in tax treatment," when state law itself specifically provides that all the affected taxpayers are in the same category for tax purposes. 488 U. S., at 343; see *Hillsborough* v. *Cromwell*, 326 U. S. 620, 623 (1946) ("The equal protection clause . . . protects the individual from state action which selects him out for

discriminatory treatment by subjecting him to taxes not imposed on others of the same class").

In this case, the Brisbane/Manning Sanitary Sewers Project allowed 180 property owners to have their homes hooked up to the City of Indianapolis's sewer system under the State's Barrett Law. That law requires sewer costs to "be primarily apportioned equally among all abutting lands or lots." Ind. Code §36–9–39–15(b)(3) (2011). In the case of Brisbane/Manning, the cost came to $9,278 for each property owner. Some of the property owners— petitioners here—paid the full $9,278 up front. Others elected the option of paying in installments. Shortly after hook-up, the City switched to a new financing system and decided to forgive the hook-up debts of those paying on an installment plan. The City refused, however, to refund any portion of the payments made by their identically situated neighbors who had already paid the full amount due. The result was that while petitioners each paid the City $9,278 for their hook-ups, more than half their neighbors paid less than $500 for the same improvement—some as little as $309.27. Another quarter paid less than $1,000. Petitioners thus paid between 10 and 30 times as much for their sewer hook-ups as their neighbors.

In seeking to justify this gross disparity, the City explained that it was presented with three choices: First, it could have continued to collect the installment plan payments of those who had not yet settled their debts under the old system. Second, it could have forgiven all those debts and given equivalent refunds to those who had made lump sum payments up front. Or third, it could have forgiven the future payments and not refunded payments that had already been made. The first two choices had the benefit of complying with state law, treating all of Indianapolis's citizens equally, and comporting with the Constitution. The City chose the third option.

And what did the City believe was sufficient to justify a

system that would effectively charge petitioners *30 times more* than their neighbors for the *same* service—when state law promised equal treatment? Two things: the desire to avoid administrative hassle and the "fiscal[] chal-leng[e]" of giving back money it wanted to keep. Brief for Respondents 35–36. I cannot agree that those reasons pass constitutional muster, even under rational basis review.

The City argues that either of the other options for transitioning away from the Barrett Law would have been "immensely difficult from an administrative standpoint." *Id.,* at 36. The Court accepts this rationale, observing that "[o]rdinarily, administrative considerations can justify a tax-related distinction." *Ante*, at 7. The cases the Court cites, however, stand only for the proposition that a legis-lature crafting a tax scheme may take administrative concerns into consideration when creating classes of tax-able entities that may be taxed differently. See, *e.g.*, *Lehnhausen* v. *Lake Shore Auto Parts Co.*, 410 U. S. 356, 359 (1973) (a State may "draw lines that treat one class of individuals or entities differently from the others"); *Mad-den* v. *Kentucky*, 309 U. S. 83, 87 (1940) (referring to the "broad discretion as to classification possessed by a legis-lature"); *Carmichael* v. *Southern Coal & Coke Co.*, 301 U. S. 495, 510–511 (1937) (discussing permissible consid-erations for the legislature in establishing a tax scheme).

Here, however, Indiana's tax scheme explicitly provides that costs will "be primarily apportioned *equally* among all abutting lands or lots." Ind. Code §36–9–39–15(b)(3) (emphasis added). The legislature has therefore decreed that all abutting landowners are within the same class. We have never before held that administrative burdens justify grossly disparate tax treatment of those the State has provided should be treated alike. Indeed, in *Allegheny Pittsburgh* the County argued that its unequal assess-ments were based on "[a]dministrative cost[]" concerns, to

no avail. Brief for Respondent, O. T. 1988, No. 87–1303, p. 22. The reason we have rejected this argument is obvious: The Equal Protection Clause does not provide that no State shall "deny to any person within its jurisdiction the equal protection of the laws, unless it's too much of a bother."

Even if the Court were inclined to decide that administrative burdens alone may sometimes justify grossly disparate treatment of members of the same class, this would hardly be the case to do that. The City claims it cannot issue refunds because the process would be too difficult, requiring that it pore over records of old projects to determine which homeowners had overpaid and by how much. Brief for Respondents 36. But holding that the City must refund petitioners' overpayments would not mean that it has to refund overpayments in every Barrett Law project. The Equal Protection Clause is concerned with "gross" disparity in taxing. Because the Brisbane/Manning project was initiated shortly before the Barrett Law transition, the disparity between what petitioners paid in comparison to their installment plan neighbors was dramatic. Not so with respect to, for example, a project initiated 10 years earlier, because for those projects even installment plan payers will have largely satisfied their debts, resulting in far less significant disparities.

To the extent a ruling for petitioners would require issuing refunds to others who overpaid under the Barrett Law, I think the city workers are up to the task. The City has in fact already produced records showing exactly how much each lump-sum payer overpaid in *every* active Barrett Law Project—to the penny. Record in *Cox* v. *Indianapolis,* No. 1:09–cv–0435 (SD Ind.), Doc. 98–1 (Exh. A). What the city employees would need to do, therefore, is cut the checks and mail them out.

Certainly the job need not involve the complicated procedure the Court describes in an attempt to bolster its

administrative convenience argument. Under the Court's view the City would apparently continue to accept monthly payments from installment plan homeowners in order to gradually repay the money it owes to those who paid in a lump sum. *Ante*, at 9, 12. But this approach was never dreamt of by the City itself. See Brief for Respondents 18 (setting out City's "three basic [transition] options," none of which involved the Court's gradual refund scheme).

The Court suggests that the City's administrative convenience argument is one with which the law is comfortable. The Court compares the City's decision to forgive the installment balances to the sort of parking ticket and mortgage payment amnesty programs that currently abound. *Ante*, at 9. This analogy is misplaced: Amnesty programs are designed to entice those who are unlikely ever to pay their debts to come forward and pay at least a portion of what they owe. It is not administrative convenience alone that justifies such schemes. In a sense, these schemes help remedy payment inequities by prompting those who would pay nothing to pay at least some of their fair share. The same cannot be said of the City's system.

The Court is willing to concede that "administrative considerations could not justify . . . an unfair system" in which "a city arbitrarily allocate[s] taxes among a few citizens while forgiving many others on the ground that it is cheaper and easier to collect taxes from a few people than from many." *Ante*, at 11. Cold comfort, that. If the quoted language does not accurately describe this case, I am not sure what it would reach.

The Court wisely does not embrace the City's alternative argument that the unequal tax burden is justified because "it would have been fiscally challenging to issue refunds." Brief for Respondents 35. "Fiscally challenging" gives euphemism a bad name. The City's claim that it has already spent petitioners' money is hardly worth a response, and the City recognizes as much when it admits it

could provide refunds to petitioners by "arrang[ing] for payments from non-Barrett Law sources." *Id.*, at 36. One cannot evade returning money to its rightful owner by the simple expedient of spending it. The "fiscal challenge" justification seems particularly inappropriate in this case, as the City—with an annual budget of approximately $900 million—admits that the cost of refunding all of petitioners' money would be approximately $300,000. Adopted 2012 Budget for the Consolidated City of Indianapolis, Marion County (Oct. 17, 2011), p. 7; Tr. of Oral Arg. 17, 58.

Equally unconvincing is the Court's attempt to distinguish *Allegheny Pittsburgh*. The Court claims that case was different because it involved "a clear state law requirement clearly and dramatically violated." *Ante*, at 14. Nothing less is at stake here. Indiana law requires that the costs of sewer projects be "apportioned equally among all abutting lands." Ind. Code §36–9–39–15(b)(3). The City has instead apportioned the costs of the Brisbane/ Manning project such that petitioners paid between 10 and 30 times as much as their neighbors. Worse still, it has done so in order to avoid administrative hassle and save a bit of money. To paraphrase A Man for All Seasons: "It profits a city nothing to give up treating its citizens equally for the whole world . . . but for $300,000?" See R. Bolt, A Man for All Seasons, act II, p. 158 (1st Vintage Int'l ed. 1990).

Our precedents do not ask for much from government in this area—only "rough equality in tax treatment." *Allegheny Pittsburgh*, 488 U. S., at 343. The Court reminds us that *Allegheny Pittsburgh* is a "rare case." *Ante,* at 14. It is and should be; we give great leeway to taxing authorities in this area, for good and sufficient reasons. But every generation or so a case comes along when this Court needs to say enough is enough, if the Equal Protection Clause is to retain any force in this context. *Allegheny*

*Pittsburgh* was such a case; so is this one. Indiana law promised neighboring homeowners that they would be treated equally when it came to paying for sewer hook-ups. The City then ended up charging some homeowners *30 times* what it charged their neighbors for the same hook-ups. The equal protection violation is plain. I would accordingly reverse the decision of the Indiana Supreme Court, and respectfully dissent from the Court's decision to do otherwise.